John H. PLATT, Jr., Plaintiff and Counterclaim Defendant,

v.

UNITED STATES of America, Defendant and Counterclaim Plaintiff,

v.

Martin H. ROEFER, Additional Counterclaim Defendant.

Martin H. ROEFER, Plaintiff and Counterclaim Defendant,

v.

UNITED STATES of America, Defendant.

Nos. 80 C 0687, 80 C 1549.

United States District Court, N. D. Illinois, E. D.

June 12, 1981.

Daniel S. Japha, Jenner & Block, Chicago, Ill., for Platt.

Stephen Levy, Block, Levy & Becker, Chtd., Chicago, Ill., for Roefer.

John S. Miles, Trial Atty., Tax Div., Dept. of Justice, Washington, D. C., for the U. S.

MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

This is a consolidation of separate tax refund suits brought by Martin H. Roefer ("Roefer") and John H. Platt, Jr. ("Platt"). The United States has filed counterclaims against both Roefer and Platt for the payment of additional amounts. This case arises due to the failure of Dot Engravers, Inc. ("Dot") to pay federal employment taxes for calendar quarters ending September 30, 1975, and December 31, 1975. At all relevant times, Platt was the president and a 30 percent shareholder of Dot and Roefer was chairman of the Dot board of directors and a 70 percent shareholder. This matter is currently before the Court on plaintiffs' motions for summary judgment with respect both to their claims and the government's counterclaims.

The following facts are undisputed. Dot was an Illinois corporation engaged in the graphics arts business. In 1972, Dot borrowed large sums of money from Associates Capital, Inc. ("Associates"), an Indiana finance company. Associates required extensive collateral for the loan, including all of Dot's accounts receivable. As a consequence of this accounts receivable and financing agreement, employees of Dot were in regular contact with representatives of Associates to make sure that funds were available to cover the checks written by Dot.

In mid-1974, Dot negotiated with Color Associates, ("Color"), a Missouri graphics company, for the sale of its stock. Representatives of Associates met with Aron Katzman ("Katzman"), who was then vice-president of Color. Katzman told Associates that Color was interested in purchasing Dot and that Color desired Associates to continue the financing after the purchase.

Dot then entered into two contracts with Color, both dated September 15, 1974. The first was a Loan and Security Agreement wherein Color loaned Dot $50,000. One of the conditions of the loan was that Dot enter into an exclusive management agreement with a manager approved by Color, "pursuant to which the manager will have complete control of and management responsibilities for [Dot's] business, including complete control over [Dot's] bank accounts, business records and responsibility for supervision of [Dot's] sales and payment of salaries, commissions, and business expenses." As additional consideration for the loan, Platt and Roefer granted to Color an exclusive one-year option to purchase all of their outstanding capital stock for the sum of $10,000.

The second contract entered into between Dot and Color and dated September 15, 1974, was a Management Agreement. Under the terms of that Agreement, Color was to serve as the "manager" referred to in the Loan Agreement described above. As manager, Color was "to operate Dot's business" for three years or until the loan was repaid. Specifically, the Management Agreement provided that Color was to "provide sole and exclusive supervision of the operation of the business." In addition to a myriad of other responsibilities delegated to Color under the contract,[1] paragraph 3(e) of the

---

1. Paragraph 3 of the Management Agreement, labeled "Services of Manager," states as follows:

   3. *Services of Manager.* Manager's services to Dot shall consist of the following:
   (a) Manager shall have the exclusive authority to employ all personnel needed to operate the business, as well as the authority to terminate any employee of the business, except as otherwise provided by individual employment contracts.
   (b) Manager shall provide sole and exclusive supervision of the operation of the business.

   (c) Manager shall have the exclusive responsibility for the supervision of the sales of the business, which shall be solicited by Dot's employees in the name of Dot.
   (d) Manager shall be responsible for obtaining all licenses and permits necessary for the operation of the said business. All of said licenses and permits shall be obtained in the name of Dot and the cost of obtaining said licenses and permits shall be charged to the business as an expense of operation and shall be paid out of the Dot bank account as provided in paragraph 5 hereof.
   (e) [Quoted in text.]

Management Agreement provided Color with sole responsibility for payment of all wage taxes under the following provisions:

> (e) Manager [Color] shall have exclusive responsibility for issuing checks in payment for all wages of Dot's employees, as well as the payment of all federal and state withholding taxes attributable to said wages....

Furthermore, the Agreement stated that Color was to have "full power and authority to do all things necessary or reasonably proper in Manager's [Color's] sole judgment to bring about the efficient operation of the business and its maintenance and operation...."

The Management Agreement further provided that Color was to take exclusive possession of all Dot's bank accounts. Withdrawals from these accounts to cover all operating expenses were to be made by Color in its sole discretion.[2] The record indicates, however, that Dot's bank accounts never were transferred to Color. Color also was responsible for maintaining the books and records of Dot pertaining to the operation of the business.[3]

Thus, as of September 15, 1974, Dot contractually turned full management responsibility over to Color. Color exercised its responsibilities under the Management Agreement primarily through Aron Katzman, although other representatives of Color also made occasional visits to Dot. From September 15, 1975, until the end of October, 1975, Katzman, on behalf of Color, basically directed the affairs of Dot. For the first year of the arrangement, Katzman spent several days per week in Dot's offices, though during August, September and October, 1975, Katzman's appearances in Dot's offices were somewhat curtailed. During this period, any decisions made with respect to money had to be approved by Katzman or Color. The only constraint that Katz-

(f) Manager shall be responsible for securing and keeping in effect workmen's compensation insurance and public liability insurance, with limits of $_____ for one person and $_____ aggregate per accident, and $_____ for property damage, all of which insurance shall be obtained in the name of Dot. The expense of said insurance shall be considered an expense of operating the business and shall be paid from funds of Dot, as provided in paragraph 5 hereof.

(g) In general, Manager shall be responsible for and provide such services as will be required to operate the business as if it were owned by Manager, except that Manager shall not be financially responsible for any expenses of Dot or any of the debts of Dot.

2. Paragraph 5 of the Management Agreement states as follows:

5. *Bank Accounts.* (A) Concurrent with the execution of this Agreement, Dot agrees to transfer all of its present bank accounts (including savings accounts and certificates of deposit, if any) to the exclusive possession of Manager, which accounts shall be maintained and used by Manager solely for operation of Dot's business. Dot shall designate such of Manager's employees as Manager may select as authorized signatories on all of Dot's bank accounts. Manager may open and maintain such bank account or bank accounts in the name of the business as Manager may from time to time designate.

(B) All business receipts of the business shall be deposited by Manager in the said account or accounts, and withdrawals from the said account may be made only upon the signature or signatures of personnel designated by Manager to make such withdrawals.

(C) The money deposited in the said bank account or accounts shall be used to provide the operating funds for payroll and other expenses that may from time to time be required for the operation of the business, in the Manager's sole discretion. Manager shall make withdrawals as necessary from the said accounts to cover all operating expenses of the business.

3. Paragraph 6 of the Management Agreement states as follows:

6. *Accounting.* (A) Manager agrees to maintain books and records pertaining to the operation of the business in accordance with generally accepted accounting practices. These books shall be available for inspection by Dot during normal business hours at Manager's place of business.

(B) Manager shall be responsible for employing an accounting firm for the purpose of preparing periodic profit and loss statements and balance sheets reflecting the financial status of the business; provided, however, that the accounting expenses incurred in the preparation of these financial statements, as well as the cost of maintaining the books and records of the business, shall be charged as an expense of operating the business and shall be paid from the bank accounts of Dot, as provided in paragraph 5 hereof.

man faced as he directed Dot's business was provided by Associates, not by Platt, Roefer, or any of the Dot employees.[4] Indeed, from September 15, 1974, until the end of October, 1975, Platt and Roefer rarely were consulted by Katzman with respect to management of Dot, although Katzman frequently discussed management of Dot with representatives of Associates. Associates did not deal with Roefer or Platt or look to them to make any decisions after the execution of the Management Agreement.

From the time Color assumed responsibility for managing Dot's business, it required that Dot's corporate tax returns be prepared by a firm of accountants which also serviced Color. Although Dot's federal employment tax returns were prepared by Dot's bookkeeper, Mary Andres, Katzman reviewed the returns. Katzman did not discuss the returns with Platt or Roefer.

During the calendar quarter ending September 30, 1975, Dot failed to pay its federal employment taxes. This decision was made by Katzman after discussions with representatives of Associates and the owners of Color. Katzman felt that he had no alternative but to refrain from paying the taxes because he believed that Associates would not have allowed him to put the checks through to the government. Katzman did not consult with Platt or Roefer about his decision regarding the non-payment of employee taxes.[5]

When Color's one-year option to purchase the stock of Dot was about to expire on September 15, 1975, Color requested and received a one-month extension, which was extended once again until October 25, 1975. Throughout this period, Platt and Roefer believed that Color intended to exercise its option to purchase Dot. Color, however, did not exercise its option.

In fact, when the last option period expired, Color abandoned its interest in Dot. Although the Management Agreement technically remained in full force, by the end of October, 1975, Katzman stopped coming to Dot, and Color ceased its active role in the management of Dot. With Color no longer involved in Dot's management, Platt and Roefer, along with Mary Andres and David Roefer performed the functions that Color had performed over the previous thirteen months,[6] although Associates continued to be consulted regularly.

In early November, 1975, Mr. E. Goff of the Internal Revenue Office in Chicago visited Dot and told Platt and David Roefer (plaintiff Roefer's son) that Dot's federal employment tax liability had not been paid. Dot arranged with the IRS to make weekly or bi-weekly payments and to make monthly payments of $5,000 commencing in January, 1976. Throughout November and December, 1975, however, Dot made payments to creditors in excess of their total tax liabilities. Moreover, the monthly payments never were made. Associates stopped advancing funds to Dot, and Dot ceased operations on December 19, 1975. All of Dot's assets thereafter were distributed in bankruptcy proceedings.

In 1978, the Internal Revenue Service assessed against both Platt and Roefer the statutory 100 percent penalty amounting to

---

4. Katzman's deposition p. 19:
   Q. What would happen when Dot received vouchers from its suppliers that needed to be paid? Who would be in charge of issuing and signing the checks?
   A. I certainly made as much and as many of the decisions as I was able to make, under the constraints of Associates Capital.

5. Katzman deposition p. 21:
   Q. Mr. Katzman, do you recall whether you would consult with either Mr. Platt or Mr. Roefer in connection with the decision as to whether the employment taxes should be paid currently?
   A. I don't think I ever consulted with him.

Q. On that matter or any matter?
A. I consulted with him very little on any matter, because we had the management responsibility.

6. Roefer deposition pp. 62–63:
   Q. Who performed the functions that Color used to perform?
   A. A whole group of people.
   Q. Who are they?
   A. Mary Andres, myself, Jack, David Roefer, myself.
   Q. When you say Jack, you mean Mr. Platt?
   A. Yes, sir.

$128,309.11 for their alleged willful failure to pay employment taxes for the calendar quarters ending September 30, 1975, and December 31, 1975. On August 10, 1979, Roefer paid $85.00 for each of the two delinquent quarters as the trust fund liability for one employee of Dot and filed a claim for refund of the amounts paid and abatement of the balance of the assessment of $128,309.11. Similarly, on May 1, 1979, Platt paid $50.00 for each of the two delinquent quarters and filed a claim for refund and abatement.

Section 6672 of the Internal Revenue Code of 1954, 26 U.S.C. § 6672, provides that:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

The two elements necessary to make section 6672 applicable to a person are: (1) the person must be "required" to collect and pay over the tax, and (2) the person must willfully fail to comply with that duty. Plaintiffs argue that based on the uncontroverted facts, the government is incapable of proving either of the two elements necessary to establish liability under § 6672.

Plaintiffs contend that from September 15, 1974, until the end of October, 1975, they were not the persons required to collect, truthfully account for, and pay over the taxes owed by Dot, because during that period the exclusive responsibility to account for and pay over any tax debt contractually belonged to Color. For the period subsequent to October 31, 1975, plaintiffs assert a two-prong argument. First, that Color, by the terms of the Management Agreement, technically continued to hold exclusive responsibility for the payment of taxes, even though as a practical matter, Color ceased performance at the end of October, 1975; and second, that both before and after Color took over the direction of Dot, plaintiffs were not "required" to make tax payments because all checks had to be cleared through Associates.

■ For purposes of § 6672, a "person" is an officer or employee of a corporation who is under a duty to perform the act in respect of which the violation occurs. 26 U.S.C. § 6671(b). Sections 6671 and 6672 have been widely interpreted to make liable those persons who are so connected with a business as to be in a position to exercise full authority over financial affairs; thus liability is not strictly limited to those holding formal positions within a corporation. *Rimbey v. United States*, 42 AFTR 2d 78–5814 (7th Cir. 1978); *Haffa v. United States*, 516 F.2d 931 (7th Cir. 1975); *Adams v. United States*, 504 F.2d 73 (7th Cir. 1974). As the Seventh Circuit has stated, "liability under § 6672 rests upon those persons who control the fiscal policy of the employer, i. e., those who make the decisions as to allocation of funds among creditors." *Rimbey v. United States, supra*, at 78–5815.

■ As is clear from the recitation of facts described above, during the period between September 15, 1974, and the end of October, 1975, Platt and Roefer did not have the power and responsibility for making Dot's fiscal policy. Decisionmaking power and responsibility lay with Color. This finding is based upon two facts: (1) that Color was contractually bound as the sole and exclusive manager of Dot's business, and (2) that as a practical matter, without consulting Platt and Roefer, Color directed all aspects of Dot's business specifically including the preparation of tax papers, the payment of taxes, and the allocation of funds.[7]

---

7. A company and its officers and employees cannot escape tax liability merely by contracting away the responsibility to allocate funds and pay taxes, while retaining power to make important decisions as to the company's finances and management.

The facts in this case are similar to those in *Couture v. United States*, 74–2 U.S.T.C. 9706 (W.D.Wash.1974), where a company was refused desperately needed financing unless it would enter into a management agreement. The company entered into the agreement pursuant to which the owners of the company surrendered complete control of the company to third parties who failed to pay employment taxes and who eventually absconded with company funds. As in the instant case, plaintiffs had neither technical nor practical control of their company and consequently were held not to be responsible persons within the meaning of § 6672.[8]

■ The government has failed to provide any evidence that Platt or Roefer retained any power or responsibility for Dot during the period when Color was directing the business. Although the party opposing a motion for summary judgment is entitled to all reasonable inferences that can be made in its favor from the evidence in the record, *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Moutoux v. Gulling Auto Electric*, 295 F.2d 573, 576 (7th Cir. 1961), when the moving party has clearly established facts that defeat the opposing party's claim, the opposing party may have a duty to go forward with controverting facts. *Patterson v. General Motors Corp.*, 631 F.2d 476, 483 (7th Cir. 1980). In this case, Platt and Roefer have shown, through their deposition testimony and the deposition testimony of Katzman and Peter V. Baranko of Associates, that there is no material issue of fact as to Platt and Roefer's lack of power and responsibility to control the financial affairs of Dot between September 14, 1974, and October 31, 1975. The only material factual dispute in this case concerns the time at which Roefer and Platt became aware that the employment taxes for Dot were not being paid. This issue, while precluding any determination as to Platt and Roefer's willfulness, has no bearing on the question of whether they were "required" to collect and pay the tax within the meaning of § 6672.

The government points out that Platt and Roefer were the sole shareholders of Dot, managerial employees of Dot, and members of the board of directors. Both were authorized to, and did, sign checks of the corporation during the periods at issue. In the absence of any facts going directly to the question of who had the power and authority to make decisions regarding the direction of the company and the allocation of funds, the facts recited by the government might raise an inference that power and authority rested with Platt and Roefer. *See Kalb v. United States*, 505 F.2d 506, 511 (2d Cir. 1974). However, this is not a case with an absence of facts regarding the ultimate issue. The facts in the case are plentiful, they are uncontroverted, and they go directly to the ultimate issue. While it is true that Platt and Roefer were authorized to, and did, sign checks of Dot, the uncontested facts show that Platt and Roefer had no control over the disbursement of funds.[9]

---

8. The court also found that plaintiffs, who had a limited education, had not acted willfully in their failure to pay the company's employment taxes.

9. Roefer deposition pp. 44–45:

Q. At the time that Dot entered into the management agreement with Color, was it contemplated by Dot that Color would become signatory on checks?

A. No, sir. They had the responsibility of the bank accounts and as an accommodation because we were local, they asked us to sign them. They took our cards from the bank that we had signed, our signature cards, brought new cards and put the people they wanted on the signature.

I think Mary Andres was added at that time because they were working directly with her and she'd have been working with all the checkbooks.

Q. As far as actually signing the checks during the time subsequent to September of '74, did that procedure change at all? Would it still be any two individuals that happened to be present?

A. During the time subsequent—you lost me.

Q. After Color came in in September of 1974, did the procedure for signing checks change at all?

A. Yes. Mary Andres had to get permission to write every check, even if it was for $1.72 or even to dispense $1.72 out of petty cash,

The issue is not who signed Dot's checks, but rather, who decided that the checks should be written and the funds allocated. While it is true that Platt and Roefer were the sole shareholders of Dot, that statement is of no probative value in light of the uncontested deposition testimony that Platt and Roefer did not manage the affairs of Dot or direct the disbursements made by Dot between September 15, 1974, and October 31, 1975. The government has failed to provide any facts in support of its contention that Platt and Roefer were the parties responsible for the allocation of Dot's funds, the direction of Dot's fiscal policy, and the non-payment of Dot's taxes.

■ Accordingly, this Court concludes that Platt and Roefer did not have the power or authority to control Dot's fiscal policy between September 14, 1974, and October 31, 1975, and consequently they were not "required" to collect and pay the tax within the meaning of § 6672.

■ With respect to the period subsequent to October 31, 1975, Platt and Roefer have failed to show that they were without the power and authority to make decisions as to Dot's funds. The fact that Color maintained technical responsibility for directing Dot's business through September 15, 1977, does not alter the fact that on a practical level, Color ceased management of Dot at the end of October, 1975, and from that day hence, Platt and Roefer, among others, performed the functions that Color previously had performed. Liability under § 6672 was not intended to be predicated upon technical contractual obligations. Rather, liability attaches to those with power and responsibility for seeing that taxes are paid to the government. *Monday v. United States*, 421 F.2d 1210, 1214 (7th Cir. 1970). Thus, Color's technical responsibility for the management of Dot after the end of October, 1975, does not preclude the liability of Platt and Roefer under § 6672.

■ Furthermore, the fact that after October 31, 1975, Associates continued to be consulted regarding the drafting of checks on Dot's account does not necessarily mean that Platt and Roefer were without power and authority regarding disbursements. The existence of power and authority in more than one person has no effect on the taxpayer's liability. *Monday v. United States, supra*, 421 F.2d at 1214. In order to prevail on a motion for summary judgment, or at trial, a plaintiff must show that he lacked the necessary power and authority to control fiscal policy—not that another person shared that power and authority. It is obvious that persons other than Associates retained power over the allocation of funds after Color terminated its involvement with Dot because it was Dot representatives who arranged with Mr. Goff and the Internal Revenue Service for tax payments to be made on a weekly or bi-weekly basis. Also, it was Roefer who assured Goff in a letter dated December 10, 1975, that Dot was going to begin monthly payments of $5,000 in December, 1975. Clearly, Associates did not retain sole discretionary power over the disbursements.

For the foregoing reasons, Platt and Roefer's motions for summary judgment are granted with respect to the period between September 15, 1974, and October 31, 1975,

---

make a $4 phone call to St. Louis to dispense $1.72. That happened many times.
Q. Did that situation exist throughout that entire one-year period?
A. Yes, sir.
Q. Who would she call in St. Louis?
A. Aron Katzman only.
Q. Did anyone beside Mary Andres seek permission to cut checks?
A. No.
Q. Were you ever consulted after September of '74 with respect to the payment of any creditors by anyone at Dot?
A. Was I consulted by whom?
Q. Anyone at Dot?
A. I don't believe so.
Q. Would you have been consulted by anyone from Associates or anyone from Color in connection with the payments to any creditors?
A. I had nothing to do with the creditors at that time.
Q. So your answer is no?
A. Yes, sir.
Katzman deposition pp. 25–26:
Q. Well, who decided which checks should be written, in the first instance?
A. Me.

and denied for the period subsequent to October 31, 1975.  It is so ordered.