The **PURDY COMPANY OF ILLINOIS,**
an Illinois Corporation,
**Plaintiff-Appellant,**

v.

**UNITED STATES of America,**
**Defendant-Appellee.**

**No. 86–1321.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 4, 1986.

Decided March 11, 1987.

Matthew J. Iverson Abramson & Fox,
Chicago, Ill., for plaintiff-appellant.

Jane S. Kimball, Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D.C., for defendant-appellee.

Before BAUER, Chief Judge, and CUDAHY and RIPPLE, Circuit Judges.

CUDAHY, Circuit Judge.

This appeal involves a claim by The Purdy Company of Illinois (the "taxpayer") against the United States and a counterclaim by the United States, regarding the alleged liability of the taxpayer under 26 U.S.C. § 6672(a) (1982), as a "responsible person" for the payment over to the government of federal employment taxes withheld from the wages of employees of Nick Pavletic Pontiac, Inc. ("Pontiac"). The district court entered judgment against the taxpayer for the amount of a penalty attributable to taxes owing for the third and fourth quarters of 1974 plus interest. The taxpayer appeals. Because we agree with the district court that the taxpayer was a responsible person who willfully avoided paying withholding taxes, and because in these circumstances the taxpayer was responsible for paying over certain after-acquired funds, we affirm the judgment.

## I.

Pontiac was an automobile dealership that operated in Chicago during the early 1970's. Pavletic was its chief executive officer and initially its sole shareholder. As a result of serious financial difficulties in the summer of 1974, Pavletic sought the taxpayer's assistance in August of that year. After some investigation, the taxpayer, through John Purdy, its president, purchased 49% of the stock of Pontiac for $20,000. In August 1974, Pavletic assigned to the taxpayer certain pension and profit sharing plan rebates. In September Pavletic agreed to deliver to the taxpayer the money due Pontiac from the yearly "2% holdback" by General Motors on sales of new General Motors cars to the dealership. The holdback check, which was based upon Pontiac's volume of purchases from General Motors throughout 1974, was delivered by General Motors to Pontiac on January 3,

1975, in the amount of $16,427.45. Also in September 1974, John Purdy arranged a $15,000 loan for Pavletic which the taxpayer fully guaranteed, apparently relying on the 2% holdback as security. In October 1974, the taxpayer lent Pontiac an additional $15,000 for use in its operations. Thus, from August through October 1974, the taxpayer, directly or indirectly, advanced a total of $50,000 to Pontiac, which enabled the dealership to continue in business.

On or about November 4, 1974, General Motors Acceptance Corp. withdrew its floor-plan financing for Pontiac, and the Standard Heritage Bank, of which John Purdy was a director and shareholder, undertook to finance Pontiac. As a part of this new floor-plan financing arrangement, the taxpayer agreed to guarantee Pontiac's indebtedness and was given the power and duty to co-sign all Pontiac checks and to review and approve all Pontiac expenditures. The taxpayer, through Mr. Boyle— one of its employees and John Purdy's son-in-law—exercised that power by co-signing all Pontiac checks and approving all Pontiac expenditures from and after approximately November 18, 1974.

From that date onward, Pontiac's bookkeeper prepared a "daily cash report" for Boyle's use, setting forth, with respect to the bank accounts then maintained by Pontiac, all amounts received and deposited in each account for the day, the amounts available to be disbursed, all proposed disbursements and the creditor that was to receive each disbursement. Boyle reviewed all reports, proposed disbursements and the related invoices; he disapproved payments to creditors that he determined were not legitimate.

After consulting with Pontiac's insurance agent, Boyle also required that steps be taken to insure against loss in the event of an attempt to steal Pontiac's inventory; every morning from the middle of November onward, Boyle visited Pontiac's premises in order to inspect its inventory and ensure that no cars had been sold "out of trust." In addition to his other responsibilities, Boyle analyzed Pontiac's financial statements for the periods running from

January 1, 1974 through October 31, 1974, and January 1, 1974 through November 30, 1974. He investigated the current value of assets listed in these statements in connection with attempts to establish a price at which the dealership might be offered for sale.

In the middle of December 1974, an agent from the Internal Revenue Service (the "IRS") met with Boyle and advised him that Pontiac was delinquent in the payment of employment taxes. The agent requested Boyle not to sign any Pontiac checks in payment of wages unless he at the same time also signed checks payable to the IRS covering the amount of the employment taxes withheld from those wages. Boyle agreed to comply with this request and did, in fact, comply.

As noted, on January 3, 1975, Pontiac received the "2% holdback" check from General Motors. Pavletic advised Boyle that the check should be used to pay the delinquent employment taxes owing for the third and fourth quarters of 1974. Nevertheless, Pavletic turned the check over to Boyle, who applied $14,000 of it against the $15,000 loan that the taxpayer had made to Pontiac in October. Both Boyle and Purdy knew that Pontiac's employment taxes for the entire third quarter of 1974 and for a portion of the fourth quarter of 1974 had not been paid when the holdback check was applied against the $15,000 debt owed to the taxpayer. During the period from November 18, 1974 through December 26, 1974, checks drawn on Pontiac's "regular" bank account and signed by Boyle in payment of creditors, other than the IRS, totaled $56,879.53. During the period from December 27, 1974 through January 23, 1975 (the date Pontiac ceased operations) similar checks totaled $36,981.27.

Pursuant to section 6672(a) of the Internal Revenue Code of 1954 (26 U.S.C.),[1] the IRS assessed a penalty of $25,922.51 against the taxpayer for failure to account for and pay over federal employment taxes withheld from the wages of the employees of Pontiac for the last two quarters of 1974 and the first quarter of 1975. The taxpayer made a partial payment of $85.38 and filed a suit for refund; the government filed a counterclaim for the unpaid balance of the assessment ($25,837.13), plus interest and statutory additions provided by law. After a two-day bench trial, the district court entered judgment against the taxpayer for the amount of the penalty attributable to employment taxes owing for the last quarter of 1974 and the first quarter of 1975. After further proceedings, the taxpayer was relieved of liability for the first quarter of 1975, but was held liable for a portion of the taxes owing for the third quarter of 1974 as well as for the taxes owing for the fourth quarter of 1974.

The district court in its original oral decision concluded that the taxpayer had assumed control of Pontiac on or around November 18, 1974 and had thereby become a "responsible person" under section 6672. By obtaining the right (in fact, the duty) to co-sign all checks of Pontiac, approve or disapprove all the agency's expenditures, and oversee the operation of the company, as well as by achieving the status of a substantial stockholder and creditor, the taxpayer had become a "responsible person" for the payment of taxes during the fourth quarter of 1974. The court found that the taxpayer, through its employee, Mr. Boyle, knew of the government's claim for delinquent taxes and willfully chose to pay itself in lieu of the government. On the other hand, the district court found that the taxpayer's involvement with Pontiac in the third quarter of 1974 was as an

---

**1.** Section 6672(a) provides in pertinent part:

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal

to the total amount of the tax evaded, or not collected, or not accounted for and paid over. 26 U.S.C. § 6672(a) (1982). As seems to be the custom, we use the phrase "responsible person" to refer to a "person required to collect, truthfully account for, and pay over any tax imposed by this title." *See Slodov v. United States*, 436 U.S. 238, 246 n. 7, 98 S.Ct. 1778, 1784 n. 7, 56 L.Ed.2d 251 (1978).

investor and creditor and that this was not such a role as to make the taxpayer a "responsible person" during that period. The court in this first decision found the taxpayer liable for 1974 fourth quarter taxes (in addition to the subsequently released 1975 first quarter taxes). See *Purdy Co. v. United States*, No. 79–C–3167, Trial Transcript ("Tr.") at 2–11 (N.D.Ill. Sept. 23, 1983).

In a subsequent decision on the motions of the parties for reconsideration, the district court decided, *inter alia*, that the taxpayer was liable for third quarter withholding taxes in an amount of $12,320.59, representing three-fourths of the holdback check received from General Motors in January. Applying *Slodov v. United States*, 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978), the court held that because some three-fourths of the holdback check was generated by sales predating the taxpayer's ownership, the taxpayer was required to apply that three-fourths against the back taxes:

> the check represents sales in 1974, for three-quarters of which time the Purdy Company was not a controlling person. Thus, three-quarters of the check does not reflect "sums received from sales in carrying on the business after [the date of assuming control]," [sic] the type of funds exempted in *Slodov*.

*Purdy Co.*, mem. op. at 3 (Jan. 28, 1986) (quoting *Slodov*). Final judgment was therefore entered against the taxpayer in the amount of $22,179.08 (the sum of $12,-320.59, the portion of the taxes owing for the third quarter of 1974 for which the taxpayer was liable, and $9,858.49, the amount of taxes owing for the fourth quarter of 1974) plus interest. The taxpayer appeals.

II.

■ Sections 3102 and 3402 of the Internal Revenue Code of 1954 (26 U.S.C.) (the "Code") require employers to withhold federal social security and income taxes from the wages of their employees. These withheld taxes constitute a special fund held in trust for the benefit of the United States

under section 7501 of the Code. If the employer withholds these "trust fund" taxes but fails to pay them over to the United States, the employee is nevertheless credited with having paid the taxes and is not liable for any additional payment. *See Slodov v. United States*, 433 U.S. at 243 n. 4, 98 S.Ct. at 1783 n. 4. Thus, to avoid loss of revenue, the government must have recourse against the employer. Sections 3102(b) and 3403 of the Code establish that the employer is liable for unpaid wage withholdings; the government has several avenues by which to assure payment. To protect against future losses the government can require that the employer establish a separate bank account—essentially a trust fund—in which withholdings must be segregated. *See* 26 U.S.C. § 7512. To recover past-due withholdings the government can, with the normal procedures of assessment, notice and demand, obtain a lien upon the employer's property and take the proceeds of a forced sale. *See* 26 U.S.C. §§ 6321, 6331–6344, 7501. The government can also seek penalties assessable against the employer for tax delinquencies. *See* 26 U.S.C. §§ 6656, 7202, 7215. In addition to recourse against the employer, the government in certain circumstances may seek payment from individuals associated with the employer: when an official or employee who is required to collect, account for and pay over employment taxes for the employer willfully fails to do so, he or she is personally liable for a penalty equal to the amount of the unpaid taxes. 26 U.S.C. § 6672. As administered by the IRS, section 6672 "brings to the government only the same amount to which it was entitled by way of the tax," and " 'is simply a means of insuring that the tax is paid.' " *Newsome v. United States*, 431 F.2d 742, 745 (5th Cir. 1970) (quoting *Botta v. Scanlon*, 314 F.2d 392, 393 (2d Cir.1963)).

Wage withholdings can be a "tempting source of ready cash" for a financially troubled employer, *see Slodov*, 436 U.S. at 243, 98 S.Ct. at 1783, because although the withholdings accrue as wages are paid, they generally are tendered to the government only quarterly. Not surprisingly,

then, when the IRS seeks to recover unpaid withholdings it often may find only a bankrupt employer—a state of affairs which frustrates the government in its claim to the withholdings. *Cf. United States v. Sotelo,* 436 U.S. 268, 277 n. 10, 98 S.Ct. 1795, 1801 n. 10, 56 L.Ed.2d 275 (1978). From this situation arises the importance of section 6672, which establishes that certain persons in control of the employer's affairs can be personally liable for unpaid withholdings. When a "responsible person" has been in a position of accountability throughout the period in which tax delinquencies arose, section 6672 liability has been clearly incurred. On the other hand, when a responsible person arrives at responsibility only after tax delinquencies arise, section 6672 liability is more problematic.

In *Slodov* a taxpayer assumed control of three corporations that had outstanding tax liabilities for unpaid wage withholdings. During the taxpayer's period of control, income of the corporation was used not to pay these tax delinquencies but instead to pay current operating expenses. In rejecting the government's section 6672 claim against the taxpayer, the Court held that a responsible person

> does not violate § 6672 by willfully using employer funds for purposes other than satisfaction of the trust-fund tax claims of the United States when at the time he assumed control there were no funds with which to satisfy the tax obligation and the funds thereafter generated are not directly traceable to collected taxes referred to by that statute.

436 U.S. at 259–60, 98 S.Ct. at 1791. The Court held that neither the policy underlying section 6672, nor its legislative history, nor the valid interests of competing creditors permitted an interpretation of section 6672 that would impose personal liability for every use of after-acquired funds for a purpose other than retiring the tax delinquencies. *Id.* at 251–59, 98 S.Ct. at 1787–91. We must now determine, among other things, whether the taxpayer here incurred personal liability when it failed to apply the 2% holdback check against the past-due taxes.

The taxpayer raises essentially three objections to being held liable for failure to pay over trust fund taxes in the case before us. First, it argues that it never became a "responsible person" subject to the obligations set forth in section 6672. Second, the taxpayer contends that even if Boyle, and thus the taxpayer, did possess the requisite degree of control to be deemed a "responsible person," the evidence did not show that he acted "willfully" as required to establish section 6672 liability. Third, the taxpayer urges that even if it became a "responsible person" when Boyle began co-signing checks on November 18, 1974, it should not be held liable for payroll taxes that accrued prior to that time. In particular, the taxpayer contends that there should be no liability for the amount of the General *Motors* holdback check, which was turned over to the taxpayer in January 1975 in partial satisfaction of its prior loan.

A.

■ The district court found that the taxpayer was a "responsible person" on and after November 18, 1974, and that finding is fully supported by the evidence. The taxpayer argues that it did not become a "responsible person" on November 18 (when Boyle first began to co-sign checks) because Boyle "merely assured that Pontiac checks were issued for valid corporate purposes but he made no determination whether one creditor or another should be paid." Purdy Brief at 8. Boyle's function, according to the taxpayer, was only to verify for the benefit of the bank that Pontiac's disbursements were legitimate. This interpretation is, however, contradicted by the facts in the record which demonstrate that the taxpayer not only regularly vetoed payments to certain creditors but also affirmatively directed payments to others. For example, the taxpayer through Boyle vetoed certain disbursements for telephone bills, legal services and Pavletic's salary. *See, e.g.,* Tr. at 106–07, 350–51, 371–72 (Sept. 19, 1983). Commencing with the December 27 payroll, the taxpayer, pursuant to a discussion with an IRS agent, began to

direct payment of withholding taxes. *See id.* at 65–68. In addition, the taxpayer through Boyle saw to it that $14,000 of the proceeds of the General Motors holdback check was applied toward repayment of its own loan to Pontiac. *See id.* at 379; Tr. at 10 (Sept. 23, 1983). This loan repayment was, of course, in preference to other creditors' claims and in preference to the trust fund claims of the United States. *Cf. Commonwealth Nat'l Bank v. United States,* 665 F.2d 743, 755 (5th Cir.1982); *Neckles v. United States,* 579 F.2d 938, 940 (5th Cir.1978); *Brown v. United States,* 464 F.2d 590, 591 (5th Cir.1972), *cert. denied,* 410 U.S. 908, 93 S.Ct. 962, 35 L.Ed.2d 270 (1973); *United States v. Graham,* 309 F.2d 210 (9th Cir.1962). It is relevant also that the taxpayer directed that certain policies of Pontiac be changed in order to protect existing inventory and to recall demonstrator models out on loan. *See* Tr. 54–55, 98–101, 352–53 (Sept. 19, 1983).

The "key to liability" under section 6672 is "control of finances within the employer corporation: the power to control the decision-making process by which the employer corporation allocates funds to other creditors in preference to its withholding tax obligations." *Haffa v. United States,* 516 F.2d 931, 936 (7th Cir.1975). It is sufficient that the person involved have significant control over the disbursal of corporate funds. *Adams v. United States,* 504 F.2d 73, 75 (7th Cir.1974). Section 6672 is broad enough to "reach [any] entity [including an outside lender] which assumes the function of determining whether or not the employer will pay over taxes withheld from its employees." *Id.* at 76. In the case before us the taxpayer had significant authority to control the financial affairs of Pontiac and freely exercised that power to direct payment of Pontiac funds to certain creditors in preference to the withholding tax obligation.

### B.

█ The taxpayer also argues that Boyle did not act "willfully" as required for section 6672 liability. *See Godfrey v. United States,* 748 F.2d 1568 (Fed.Cir.1984); *Bar-*

*rett v. United States,* 217 Ct.Cl. 617, 580 F.2d 449 (1978). Boyle first learned of Pontiac's earlier tax problems in late December 1974. The taxpayer contends that, since no new delinquencies (that is, defaults with respect to taxes accruing after the notice) occurred after Boyle acquired this knowledge of the earlier tax problems, it can have no liability for Pontiac's taxes.

The district court did not accept this argument nor do we. Filing of the quarterly withholding tax return for the fourth quarter of 1974 and payment of all taxes owing for that quarter were due no later than January 31, 1975. The taxpayer had attained "responsible person" status by that time, had specific knowledge of the fact that none of the fourth quarter taxes accruing prior to December 27 (or the third quarter taxes) had been paid and had more than enough unencumbered Pontiac funds available to it (as well as the General Motors holdback check) during the period from mid-December onward to see to the payment of those taxes. Its failure to do so adequately establishes the element of willfulness. *See Wright v. United States,* 809 F.2d 425 (7th Cir.1987); *Garsky v. United States,* 600 F.2d 86, 91 (7th Cir. 1979); *Howard v. United States,* 711 F.2d 729, 735 (5th Cir.1983); *Mazo v. United States,* 591 F.2d 1151, 1157 (5th Cir.), *cert. denied,* 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979); *Brown v. United States,* 591 F.2d 1136, 1140–41 (5th Cir. 1979).

In addition, given Boyle's close supervision of Pontiac's finances from November 18 onward, it is difficult to perceive how Boyle would not have known whether or not during *prior* periods taxes had been withheld and paid over to the United States. The district court indeed determined that "the Purdy Company, through its employee, Mr. Boyle, knew of the claim of the government for delinquent taxes and willfully chose to pay the Purdy Company in lieu of the government." Tr. at 10 (Sept. 23, 1983). This finding is certainly not clearly erroneous. With respect to the largest portion of the liability—the holdback check from General Motors—Mr. Boyle, of course, knew of the claim of the

government for these funds but elected to apply them instead against the taxpayer's loan. Willfulness with respect to the taxes due during the fourth quarter of 1974 is equally clear. Lack of willfulness is not a plausible basis for reversal.

### C.

The most difficult problem presented by this case is whether under the rule of *Slodov v. United States*, 436 U.S. 238, 98 S.Ct. 1778, the taxpayer may be held liable for Pontiac's third quarter withholding taxes, as well as for that portion of the fourth quarter taxes which had accrued prior to November 18 when the taxpayer assumed control. In particular, the taxpayer takes issue with the assessment of liability based upon its application of the General Motors holdback check against its own loan to Pontiac in preference to the use of these funds to reduce withholding tax deficiencies that came into existence before the taxpayer assumed the position of control. There are at least two theories by which the taxpayer might be found liable under section 6672 for failing to apply the holdback check against past tax deficiencies. First, following the approach of the district court and the government, we could construe the holdback check as funds "generated by business transacted before the change in control," and thus as funds unrelated to the new responsible person's activities, funds that must under section 6672 be applied against back taxes. Or second, we could construe the holdback amount as "funds" or "liquid assets" owned by the company at the time the responsible person gained control.

In finding the taxpayer liable for back tax deficiencies, the district court held that "the determinative fact is that the holdback check was generated by sales in part predating the [taxpayer's] ownership," and therefore the taxpayer is liable for not paying over to the IRS "funds attributable to pre-ownership business, since such funds do not result from new control over the formerly beleagured company." Mem. op. at 3 (Jan. 28, 1986). The government on appeal exhorts us to adopt a similar approach to section 6672 liability, reading *Slodov* to support its position that:

> if funds are generated from business transacted prior to the responsible person's assumption of control and not generated from business transacted "thereafter," they are considered to be as much "funds impressed with a trust" under Section 7501 for satisfaction of the Government's claim as cash actually in hand at the time of the change in control.

Government Brief at 27.

Both the district court and the government thus suggest that section 6672 liability depends upon an analysis of the *source* of after-acquired funds—if such funds are "generated by" or "attributable to" pre-ownership "business" or "sales," then the new responsible person must apply the funds against the tax deficiencies or face personal liability for an equivalent amount. It would be premature here to adopt this perhaps expansive reading of section 6672 principally because this interpretation is unnecessary for the disposition of the present case. Because, however, this government test displays a perhaps deceptive aura of equity and simplicity and therefore might seem one we should adopt now, we think some preliminary analysis is appropriate.

In this connection, *Slodov* could conceivably be construed to counsel *against* a "source" test for after-acquired funds. In its *Slodov* holding the Court delineated what funds are "trust funds" under section 7501—including wage withholdings—of a sort that section 6672 liability attaches with respect to a person who pays those funds to a creditor other than the IRS:

> We hold that a "responsible person" under § 6672 may violate the "pay over" requirement of that statute by willfully failing to pay over trust funds collected prior to his accession to control when at the time he assumed control the corporation has funds impressed with a trust under § 7501, but that § 7501 does not impress a trust on after-acquired funds....

*Slodov*, 436 U.S. at 259, 98 S.Ct. at 1791. We note, despite the government's some-

what misleading redaction of this quote in its brief, *see* Government Brief at 27, that the Court states explicitly that "§ 7501 does not impress a trust on after-acquired funds." *Slodov*, 436 U.S. at 259, 98 S.Ct. at 1791. In light of the Court's additional holding that "§ 7501 properly may be regarded as informing the scope of the duty imposed by § 6672," *id.* at 256 n. 18, 98 S.Ct. at 1789 n. 18, *Slodov* might be understood to limit section 6672 liability to only two situations: when funds are on hand at the time of accession to control, and when after-acquired funds are directly traceable to withheld taxes.

The government attempts to extract from *Slodov* the principle that funds "generated" by pre-ownership transactions are to be treated like cash on hand at the time of accession to control. Presumably this means that if an account results from a sale made before the assumption of control, whenever that account is collected and reduced to cash, the responsible person has an obligation, enforceable under section 6672, to use the cash to meet the government's trust fund claims relating to the past in preference to other creditors' claims. Perhaps such a principle can be wrung out of *Slodov*, but this is not clear. *Slodov* emphasizes as a critical consideration whether the failing corporation had "funds," *see, e.g., Slodov*, 436 U.S. at 242, 259, 260, 98 S.Ct. at 1782–83, 1791, 1791, "liquid assets," *id.* at 242, 246, 251, 98 S.Ct. at 1782–83, 1784–85, 1787, or "cash," *id.* at 251, 98 S.Ct. at 1787, on hand when the responsible person assumed control of the employer enterprise. There may be some logic to the government's position that funds derived from sales made before the

transfer of control are impressed with a trust under section 7501 even though the funds themselves are not received until after the transfer. Such funds presumably were not produced by the efforts of the new responsible person, and therefore requiring him to surrender them to the government for delinquent withholding taxes would not be inequitable. On the other hand, it might be a significant disincentive to entrepreneurs planning to take control of, and to finance, failing businesses to be faced with government trust fund claims for all funds attributable in some part to prior sales, no matter how remote.[2]

A related aspect of *Slodov* suggests that section 6672 liability should not generally reach after-acquired funds. The *Slodov* Court recited various limits on the IRS's power to defeat competing creditors in pursuit of company assets, *see Slodov*, 436 U.S. at 256–59, 98 S.Ct. at 1789–91, and noted that it would be inconsistent to impose personal liability for paying after-acquired funds to a secured creditor over whom the IRS did not even claim priority:

> Surely Congress did not intend § 6672 to hammer the responsible person with the threat of heavy civil and criminal penalties to pay over proceeds in which the [Internal Revenue] Code does not assert a priority interest.

*Id.* at 259, 98 S.Ct. at 1791. For example, payments on an account receivable might be proceeds covered under an inventory financing agreement where the inventory was sold before the responsible person acceded to control.

■ We have noted these possible reservations (but have reached no conclusions) about the approach adopted by the district

---

**2.** As the *Slodov* Court noted, if no one will save a beleagured company:

> the Government will be remitted to its claim in bankruptcy. When an immediate filing for bankruptcy means a total loss, the Government understandably ... does not discourage the corporation from continuing to operate so long as current taxes are paid. As soon as the corporation embarks upon that course, however, the "responsible person" is potentially liable to heavy civil and criminal penalties not for doing anything which compromised the

> Government's collection efforts, but for doing what the Government regards as maximizing its chances for recovery.... [This scenario] would merely discourage changes of ownership and management of financially troubled corporations and the infusion of equity or debt funding which might accompany it without encouraging employer compliance with tax obligations or facilitating collection of back taxes.

436 U.S. at 253, 98 S.Ct. at 1788.

court and urged by the government.[3] It is enough for present purposes to rely upon the *Slodov* principle that a new person in control of a failing enterprise may be personally responsible for past withholding tax delinquencies to the extent that the employer corporation had "funds" or "liquid assets" at the time of the transfer of control. *See Slodov*, 436 U.S. at 259–60, 98 S.Ct. at 1791–92; *Lassar v. United States*, No. 81–C–6890, slip op. at 15–17 (N.D.Ill. June 14, 1985) [Available on WESTLAW, DCTU database]; *Ranta v. United States*, 78–2 Tax Ct. Rep. (CCH) ¶ 9832 (S.D.N.Y. Nov. 28, 1978). Assets are liquid to the degree they are readily convertible into cash. In the case of third-party obligations the likelihood and promptness of payment are perhaps the keys to liquidity.

■ Here, the "holdback" funds retained by General Motors from Pontiac represented the accumulation of 2% rebates to be paid by General Motors on each purchase of a new car by Pontiac during 1974. Essentially, these were Pontiac's own funds held "on deposit" by an obligor of immense credit-worthiness to be returned after the first of the new year. General Motors' obligation to pay these rebates to Pontiac was, of course, fixed and their collectibility assured as of the time of the taxpayer's accession to control; the rebates were denominated on Pontiac's balance sheets as "Factory Receivables." Because this was an obligation to pay back funds within sixty days of the time of accession to control, we think this account must be considered

"liquid assets" and "funds" for purposes of *Slodov* analysis. Certainly the taxpayer was on notice that this was an item quite promptly reduceable to cash as of the time of accession to control and therefore was impressed with a trust fund obligation.

We think it would be unreasonable, as well as a departure from the principle and the clear language of *Slodov*, to construe "funds" and "liquid assets" in the possession of the employer corporation at the time of transfer of control as limited, for example, only to cash and bank accounts.[4] Further, we do not regard the taxpayer's claim that it loaned $15,000 to Pontiac on the security of the holdback account as relevant to the question whether these funds were impressed with a statutory trust fund obligation. The taxpayer's liability derives from the existence of funds and liquid assets in its control upon accession to a position as a responsible person. The mere fact that some other creditor, including the taxpayer, might be owed a debt by Pontiac—even a debt incurred against the (informal) security of the funds in question—does not alter the general requirement that such funds be paid over against back taxes.[5]

The district court, supported by ample record evidence, held that at least three-fourths of the amount of the holdback check ($12,320.59 out of $16,427.45) could be attributed to sales consummated by Pontiac before the end of the third quarter, and that therefore this amount constituted trust funds under section 7501 for which

3. While expressing reservations about imposing personal liability on a responsible person under a "source" test, we of course recognize that the IRS retains its impressive arsenal of collection devices to use against the employer itself. All after-acquired funds are income of the employer that the IRS can reach with its normal methods of enforcing tax liabilities.

4. Too limited a definition of "liquid assets" or "funds" could lead to avoidance of trust fund liability by deferring the liquidation of accounts and other non-cash assets.

5. In the present case no one has asserted that any creditor could claim an interest superior to the IRS in the funds on hand at the time of

accession to control. We thus do not have to decide the issue of what § 6672 liability might arise from a situation where the funds on hand are proceeds subject to a security agreement that is prior to the underlying tax debt. Perhaps a taxpayer can be liable for dissipating funds on hand only to the extent that such funds are impressed with a trust under § 7501, not to the extent that a creditor other than the IRS can claim an interest in the funds that would defeat the 7501 trust. *Cf. Lassar v. United States*, slip op. at 17 (government pursued § 6672 liability based on *"unencumbered* liquid assets" [emphasis added] including cashier's checks and cash).

the taxpayer was liable.[6] Because Pontiac sales in fact declined sharply in October and November, this allocation of three-fourths of the check to the first three quarters of 1974 was, if anything, somewhat more favorable than the evidence would require. We presume the allocation was made on the basis of the "source" test. The allocation would seem equally appropriate in determining the amount of the General Motors-Pontiac obligation as of the date of accession under a "funds-liquid assets" test.

The taxpayer is thus liable for not paying over funds on hand at the time of accession to control. The holdback obligation, carried on Pontiac's books as "Factory Receivables," comprises, as noted, funds or liquid assets for purposes of section 6672. Although the district court did not make a finding as to the amount of Factory Receivables and other funds on hand on November 18, 1974, the day of taxpayer's accession to control, the record reveals enough. As of October 31, 1974, Pontiac showed Factory Receivables of $17,920.80, and by November 30, 1974, that amount had risen to $18,007.28. In addition, the November 30 financial statement showed some $12,000 in cash on hand. It is clear that the taxpayer properly can be held liable for at least the amount of $12,320.59.

The judgment of the district court is therefore

AFFIRMED.

---

6. The taxpayer argues that because it personally retained only $14,000 of the holdback check and remitted the balance to Pontiac, it is liable only for three-fourths of $14,000. Taxpayer's liability, however, does not derive from amounts it received personally, but rather from amounts with respect to which it was a responsible person. Under either a "source" test or a "funds-liquid assets" test, the starting point is the amount of funds received, or owned, by Pontiac, not the taxpayer.