Robert G. PETERSON,
Plaintiff, Counterclaim–Defendant,

v.

UNITED STATES of America,
Defendant, Counterclaimant,

v.

John PETERSON, Additional
Counterclaim–Defendant.

No. 88 C 5080.

United States District Court,
N.D. Illinois, E.D.

July 24, 1990.

Sheldon Chertow, Chertow & Miller, Thomas C. Borders, McDermott, Will, & Emery, Chicago, for plaintiff, counterclaim-defendant.

Steven E. Cole, Douglas W. Snoyenbos, Tax Div., U.S. Dept. of Justice, for defendant, counterclaimant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

This action was begun and has continued in the typical pattern followed by lawsuits dealing with withholding taxes: Robert Peterson ("Robert") initially sued for a refund of the small amount of such taxes that he had paid, and the United States then counterclaimed against him and his brother John Peterson ("John") for the much larger amount of withholding taxes unpaid by the brothers' corporation (asserting that each was a "responsible person" within the meaning of the relevant statute).

This Court conducted a bench trial to deal with Robert's potential liability.[1] After the trial, each of the parties has submitted proposed findings of fact ("Findings") and conclusions of law ("Conclusions").

In accordance with Fed.R.Civ.P. 52(a), this Court finds the facts specially in the following Findings and states its conclu-

---

1. Because judgment on the United States' counterclaim was entered against John on June 6, 1989, all that remain for decision are Robert's refund claim and the United States' counterclaim against him.

sions of law in the following Conclusions. To the extent (if any) the Findings as stated may be deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings.

### Findings of Fact

1. On November 24, 1986 each of John and Robert was assessed a 100% penalty in the amount of $41,336.40, pursuant to 26 U.S.C. § 6672,[2] as a result of the asserted willful failure of each of them to collect, truthfully account for and pay over to the government withheld federal income and Federal Insurance Contribution Act ("FICA") taxes due and owing from G & F Service and Supply, Inc. ("G & F") for the third and fourth quarters of 1983, all four quarters of 1984 and the third quarter of 1985.

2. G & F and Chicago Heater, Inc. ("Chicago Heater") (collectively "Corporations") were treated as one entity for tax reporting purposes. Chicago Heater had no employees and consequently did not withhold federal taxes.

3. Robert and John are brothers who purchased all the stock in Corporations in January 1982 with funds provided by their mother. G & F was in the business of installing and servicing water heaters, while Chicago Heater was in the business of buying and selling water heaters at wholesale.

4. Before the purchase John had been living in Delaware with his family, while Robert had been engaged in the plumbing business in the Chicago area, the previous two years as a sole proprietor and for about 18 years before that as an employee of other plumbing contractors. Their mother, who was concerned over John's unemployment, found an advertisement in the Chicago Tribune want ads listing both Corporations as being for sale. She asked Robert to write to the owner, George Fancher ("Fancher"). Robert did that and then met with Fancher on several occasions before the purchase to "look over" the business and to satisfy himself that the business was "bona fide." After telephone discussions with their mother, John agreed that he would return to this area to carry out the business responsibilities referred to in Findings 5 and 6.

5. Before the acquisition, Robert and John had discussed the businesses and the business functions each would perform on at least three occasions, as described in this and the next Finding. First they had such a conversation with their mother, who expressed satisfaction that John would have a job along the lines he was accustomed to and Robert would continue to work as a plumber. They had another conversation with their mother's lawyer, who handled the purchase of the businesses and outlined the roles of each of the brothers in the businesses: Robert would do the mechanical and plumbing work, while John would perform the bookkeeping, office and accounting work for the businesses. At the time of that meeting the attorney designated Robert as President only because he was the older brother, while designating John as Secretary–Treasurer. They were the only two corporate officers. However, the lawyer did not explain to Robert the role of the President. There were no corporate bylaws, nor did the brothers then or later follow formal corporate procedures.

6. Before the purchase John and Robert also met with Ann Oliver ("Oliver"), who had been the accountant for Robert's sole proprietorship and who became the accountant for Corporations. Because of John's role of running the business, it was important for him to be comfortable with the accountant, with whom he would be in contact. At the meeting Oliver questioned John about his background and discussed the business roles of John and Robert: John would handle the paperwork and run the businesses and Robert would do the technical plumbing. It was decided that Oliver would work with John with regard to the handling of the business records, preparing monthly financial statements,

---

**2.** All further citations to provisions in Title 26 will take the form "Section ——."

payroll tax returns and all other tax returns for delivery to John.

7. Oliver testified, and this Court credits his testimony, that accounting and book work were beyond Robert's capabilities and that she never explained the G & F accounting system to Robert. It is unquestionable that Robert did not know G & F's accounting system or whether G & F had cash receipts and disbursements journals, or how G & F kept track of accounts payable or how accounts receivable were handled on G & F's books and records. Robert did not understand accounting financial statements and could not explain them to anyone else.

8. There was considerable testimony, all of which this Court credits, that Robert served as one of the two "bosses" at G & F, exercising the power to supervise and to hire and fire employees, and setting the prices charged customers for Corporations' goods and services. All those matters, however, have only indirect relevance to the matter at issue in this litigation: whether or not Robert had significant control or authority over Corporations' *finances* or general decisionmaking embracing that area of Corporations' activity. These Findings now turn to that subject.

9. Each of Corporations had an account at Bank of Hillside in Hillside, Illinois and at Uptown National Bank in Chicago. Robert was authorized to sign checks on all four corporate accounts. Each account required only one signature for issuance of a check.

10. Although Robert exercised his power to sign checks only to a limited extent, leaving that aspect of the business almost entirely to John's operation, Robert was aware of his ability to do so. Thus when the brothers' relationship had seriously deteriorated by 1984, John refused to sign Robert's dividend checks and told Robert to write out and sign his own. Robert did so, disbursing at least one $650 payment to himself in 1984 and at least 11 such payments in 1985. Robert testified that he did not get John's approval for any of the dividend checks that Robert wrote to himself except for the first, that the check

register contained no account balances and that he was not sure whether there were funds in the accounts to cover the dividend checks he wrote.

11. Robert testified that he normally signed checks only in "emergency" situations and that he considered payment of his dividends an "emergency" situation for his family, which was running short on funds. That "emergency" concept did not in his view extend to the payment to the IRS of the amounts referred to in later Findings. But no such self-imposed limitation affects his ability and authority to do so, both of which certainly existed.

12. Robert was aware from "day-one" that Corporations had cash-flow problems that had become "serious" by 1983. Robert testified that Corporations were "always behind on our bills." Robert felt that he could not confront John as to Corporations' financial problems because it would "cause a scene." On at least one occasion Robert had Oliver meet with John (with Robert present) to discuss such a problem, so that Oliver could play the "bad guy."

13. Oliver had periodic meetings throughout her term as corporate accountant, often with both brothers present, at which Corporations' finances and unpaid payroll tax liabilities were discussed. She remembered at least six meetings with both Robert and John present where unpaid payroll taxes were discussed. Robert admitted that he was present at several meetings with Oliver and that it was possible that unpaid payroll taxes were discussed at these meetings.

14. On October 19, 1983 Oliver wrote a letter to both Robert and John, reflecting that payroll taxes aggregating $19,000 for May to September 1983 were unpaid. Oliver left a copy of the letter on Robert's desk at the corporate office, but Robert denied having seen it. Given the manner in which the business operations were carried on, this Court cannot find by the requisite preponderance of the evidence that he did.

15. However, this Court does credit the testimony of Oliver that she told Robert of his potential personal liability for the unpaid payroll taxes in the second quarter of

1984, during a meeting in her office.[3] At that time she told him that the taxes hadn't been paid, that she had doubts that John would be paying them, and that it wasn't just a corporate matter but that Robert should be concerned about his own personal liability. Oliver specifically referred to the 100% penalty. Nevertheless Robert did not express alarm or concern.

16. Later in 1984, or in January 1985, Robert found several unfiled state and federal employment tax returns in the corporate file cabinet and asked Oliver whether they were important. Oliver told Robert the returns should have been filed. When Robert asked Oliver why they had not been, she told him that people often do not file such returns if they cannot pay the amount due. Nevertheless Robert did not discuss the unfiled returns with John or take any action to cause them to be filed and the taxes to be paid.

17. Robert told an IRS Revenue Officer that he became aware of the unpaid payroll taxes in June 1985 by a notice from the IRS. At trial Robert testified that he became aware of the unpaid payroll taxes through discussions with his attorney during the summer of 1985, and that he was definitely aware of the liability by July 31, 1985. Robert also stated that it was during those discussions that he became aware of what the unpaid tax liability meant to him personally. This Court does not credit Robert's testimony that he was unaware of the matters referred to in this Finding at the much earlier dates specified in Findings 15 and 16.

18. Robert testified that he "left" Corporations after Suzanne Berndt started working full-time. Based on the payroll records and Ms. Berndt's testimony, that would be February 1985. Robert testified that he would visit the corporate premises only at night after he had left. In fact,

based on the testimony of both Don and Suzanne Berndt, this Court finds that Robert did continue to visit the premises from time to time during the day after February 1985 (although not as frequently as he had in earlier years) and that he participated (though to a substantially lesser extent than before) in the running of corporate business during that period.

19. After February 1985 Robert took dividends from the corporation in the amount of $12,350, including 11 cancelled dividend checks totalling $7,800 that Robert wrote and signed for himself after February 1985. Those were the only checks of any substance written or signed by Robert after that date, but he signed at least one small check to a corporate creditor.

20. Despite the falling out between Robert and John that had led to Robert's reduced activity at the corporate premises, Robert continued to have free access to the corporate books, records and checkbooks. Robert was never barred from the corporate premises and continued to write checks until the check books were no longer at the premises—at least as late as September 3, 1985.

21. On or about September 27, 1985 there was a final meeting among Robert and John, their attorneys and Oliver, in which it was decided that the business was to be closed down. As of September 30, 1985 Corporations had accounts receivable in the amount of $91,291.48.

22. Disbursements from Corporations' checking accounts from August 1, 1985 to September 30, 1985 (not including checks written from one of the Corporations to the other) issued to creditors other than the United States amounted to at least $46,775.02.

---

3. Though Oliver later in her testimony expressed some doubt as to the specific time in 1984 when that discussion took place (she was a witness who clearly sought to be meticulous in not going beyond her recollection into "it must have happened that way, so I'll testify that it did"), her initial recollection that it occurred during the second quarter fits most closely with other evidence in the case—including the fact that Oliver did no work for G & F from early 1984 to November 1984 because John stopped providing her with the necessary corporate records. That, together with her clear recollection of the later incident referred to in Finding 16 (one corroborated by Robert himself), tends to place the conversation referred to in this Finding *before* the interruption in her work.

23. As Findings 15 and 16 reflect, Robert became aware of G & F's withholding tax liability not later than the second quarter of 1984, when Oliver told him of his potential personal liability, and again in late 1984 or January 1985 when he found several unfiled federal withholding tax forms in the corporate file cabinet and discussed them with Oliver as described in Finding 16.

## Conclusions of Law

1. This Court has jurisdiction under 28 U.S.C. § 1346(a)(1).

2. Taxes withheld from an employee's wages are to be held by the employer in trust for the United States. Sections 3402, 3102 and 7501; *Monday v. United States*, 421 F.2d 1210, 1214 (7th Cir.1970).[4]

3. Any person required to collect, truthfully account for or pay over taxes withheld from employee's wages who willfully fails to collect such tax or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or its payment thereof, is liable to a penalty equal to the total amount of the tax evaded or not collected or not accounted for or paid over. Section 6672; *Slodov v. United States*, 436 U.S. 238, 250, 98 S.Ct. 1778, 1786, 56 L.Ed.2d 251 (1978); *United States v. Schroeder*, 900 F.2d 1144, 1146 (7th Cir.1990).

4. In any litigation involving an assessment under Section 6672 the taxpayer must prove by a fair preponderance of the credible evidence that the assessment was erroneous; that is, that he or she does not owe the tax claimed by the government. *Schroeder, id.* at 1148. As part of that burden of both production and persuasion, he or she must demonstrate that the IRS' determination as to his or her responsibility or willfulness is wrong. *Ruth v. United States*, 823 F.2d 1091, 1093 (7th Cir.1987).

5. Although the assessment under Section 6672 is spoken of as a penalty, it is civil in nature: "It provides a remedy to prevent the unnecessary loss of tax funds by permitting the 'taxing authority to reach those responsible for the corporation's failure to pay the taxes which are owing.'" *Monday*, 421 F.2d at 1216.

6. Liability under Section 6672 attaches to those with the power and responsibility within the corporate structure for seeing that the taxes withheld from various sources are remitted to the Government. *Monday, id.* at 1214. Such liability is not limited to those employees performing merely mechanical functions of collection and payment, but extends to all with responsibility and authority to avoid the default that constitutes a violation of the statute. Accordingly more than one person may be liable. *Id.; Harrington v. United States*, 504 F.2d 1306, 1312 (1st Cir.1974).

7. Responsibility cannot be avoided by showing that someone else performed the function of actually disbursing the corporation's funds. Any corporate official is still considered to be responsible so long as he or she could have seen to it that the taxes were paid. *Monday*, 421 F.2d at 1214.

8. It is not necessary that a person have "exclusive" control over the corporation's financial affairs to be responsible under Section 6672. *Adams v. United States*, 504 F.2d 73, 75 (7th Cir.1974). Merely the existence of the same duty and concomitant liability in another individual has no effect on the taxpayer's responsibility. *Monday*, 421 F.2d at 1214.

9. Under Section 6672 the key to liability is significant control or authority over an enterprise's finances or over the decisionmaking process in that area of activity. *Purdy Co. of Illinois v. United*

---

**4.** As later citations reflect, *Monday* (though two decades old) remains perhaps the most extensive exposition in this Circuit of the general legal principles applicable to such withholding cases. It continues to be cited frequently for those principles (which have not changed since then), and these Conclusions will follow the lead of other courts (including our Court of Appeals and Courts of Appeals elsewhere) in that respect. By an extraordinary coincidence the two targets of the 100% penalty in that case were *Robert* and *John* Monday—also the principals in a small family-owned business.

*States,* 814 F.2d 1183, 1188 (7th Cir.1987). "Authority" in that context means *effective power* to pay. *Howard v. United States,* 711 F.2d 729, 734 (5th Cir.1983). Such authority is demonstrated by the issuance of even small checks without the approval of others in the corporation. *Id.*

■ 10. Factors that indicate such control over the financial affairs of a corporation are ownership, holding an office in the corporation, being an officer or a director, having power under the corporation's by-laws, having the power to sign checks and having the authority to borrow money on behalf of the corporation. See, e.g., *Monday,* 421 F.2d at 1215.

■ 11. Both in those legal terms and in actual reality, Robert had the requisite authority within the corporation to be considered responsible under the statute. All the factors referred to in Conclusion 10 were present in his case, and he in fact did exercise such powers (though the principal activity in those areas was conducted by John). Robert clearly had the power to pay Corporations' withholding taxes and was therefore a responsible person under Section 6672. *Landau v. United States,* 702 F.Supp. 199, 202 (N.D.Ill.1988); and see, e.g., *Latimer v. United States,* 593 F.Supp. 881, 884 (N.D.Ill.1984), *aff'd by unpublished order,* 774 F.2d 1167 (7th Cir.1985).

■ 12. To the extent that Robert did not exercise the authority he had within Corporations and delegated it to his brother John, no such delegation would relieve Robert of liability under the statute. *Harrington,* 504 F.2d at 1312; *Brown v. United States,* 552 F.Supp. 662, 665 n. 6 (N.D. Ill.1982). On that basis as well, Robert was a responsible person within the meaning of Section 6672 throughout 1983 and 1984.

■ 13. Because Robert continued to take dividends from Corporations after February 1985 and wrote at least one corporate check to a creditor other than the United States (even apart from the dividend checks he wrote to himself) after that date, and continued to participate (though to a lesser extent) in the corporate busi-

ness, Robert was also a "responsible person" for the third quarter of 1985.

■ 14. Willful conduct denotes intentional, knowing and voluntary acts. It may also indicate a reckless disregard for obvious or known risks. Willful action within the meaning of Section 6672 refers to voluntary, conscious and intentional (as opposed to accidental) decisions not to remit funds properly withheld to the Government. *Monday,* 421 F.2d at 1216. That meaning must be distinguished from the definition of "willful" in the criminal context. Liability under Section 6672 does not depend upon the presence of evil motive or specific intent to defraud the Government or deprive it of revenue. *Id.*

■ 15. "Reasonable cause" or "justifiable excuse" are also not defenses to liability under Section 6672. Those inapplicable concepts would invite consideration of such misleading and improper factors as the financial condition of the business or the demands of creditors. *Id.*

■ 16. Any person who is "responsible" within the meaning of Section 6672 throughout the period in which withheld taxes are not remitted to the Government acts willfully if, when or after he or she gains actual knowledge that the taxes are delinquent, liquid funds are available from which the taxes can be paid and he or she, having the ability to pay the taxes, fails to do so. *Garsky v. United States,* 600 F.2d 86, 91 (7th Cir.1979); *Mazo v. United States,* 591 F.2d 1151, 1154 (5th Cir.1979); *Latimer,* 593 F.Supp. at 885.

■ 17. Even if a responsible person had never gained actual knowledge of delinquent withholding taxes, he is still "liable if he (1) clearly ought to have known that (2) there was a grave risk that withholding taxes were not being paid and if (3) he was in a position to find out for certain very easily." *Wright v. United States,* 809 F.2d 425, 427 (7th Cir.1987). Thus a responsible person is liable if he or she should have known that the corporation was delinquent in paying its withholding taxes over to the Government.

18. Whether Robert may or may not have known the extent or seriousness of G & F's withholding tax deficiency is "entirely irrelevant" to the issue of willfulness and will not serve to relieve him of liability under the statute. *Brown,* 552 F.Supp. at 665. Thus it cannot be that "a responsible officer may immunize himself from the consequences of his actions by wearing blinders which will shut out all knowledge of the liability for and the nonpayment of [the corporation's] withholding taxes." *Calderone v. United States,* 799 F.2d 254, 260 (6th Cir.1986), quoting *Bolding v. United States,* 215 Ct.Cl. 148, 565 F.2d 663, 674 (1977). Willful conduct also includes failure to investigate or to correct mismanagement after having notice that withholding taxes have not been remitted to the Government. *Garsky,* 600 F.2d at 91; *Brown,* 552 F.Supp. at 665.

19. This is not a *Slodov*-type case, where an individual has become responsible for a tax liability incurred prior to that individual's assumption of responsibility. Robert was responsible during all the quarters at issue here. If this were a case in which Robert had become a "responsible person" at some point after the tax liability had accrued, he would still be responsible in the amount of Corporation's funds and liquid assets at the time he assumed responsibility. *Slodov,* 436 U.S. at 259–60, 98 S.Ct. at 1791; *Purdy Co.,* 814 F.2d at 1191. Moreover, even if a *Purdy* responsibility analysis of funds and liquid assets were to be employed in examining the willfulness aspect of this case, Robert would nonetheless be liable for the entire assessment. Even as of July 31, 1985 (the date on which Robert himself admits he became aware of the tax liability), Corporations had liquid assets in the form of $49,800 in inventory, $81,666.96 in accounts receivable and $1,711.78 in petty cash and in bank accounts. Robert has presented no evidence disputing the correctness of those figures. See *Sinder v. United States,* 655 F.2d 729, 732 (6th Cir.1981) (per curiam) (taxpayer has burden of establishing lack of available funds and liquid assets). Thus even if Robert's liability were limited to the value of Corporations' liquid assets at the time he admits he became aware of the unpaid tax liability, he would nonetheless be liable for the entire amount of the assessment against him. *Landau,* 702 F.Supp. at 203.

20. Whenever a "responsible person" becomes aware that trust-fund taxes are not being paid over to the Government or recklessly disregards facts that should put him or her on notice that they are not being paid over, his or her use of funds, or his or her knowledge of the use of funds for payments to other creditors, is willful conduct within the scope of Section 6672. *Garsky,* 600 F.2d at 91. Any such responsible person has the burden of showing that there were no funds available to pay the IRS when the individual became aware of the withholding tax liability. *Brown v. United States,* 591 F.2d 1136, 1141 (5th Cir.1979).

21. Robert acted willfully by failing to direct payment to IRS, and by disbursing at least 12 checks to creditors other than the United States after June 30, 1984 (in fact after February 1, 1985), including 11 checks to himself totalling $7,800. *Garsky,* 600 F.2d at 91; *Latimer,* 593 F.Supp. at 885. Indeed, Robert received dividends totalling $15,600 during 1985. Robert has presented no evidence of insufficient funds to pay the withholding tax liability after any of the relevant dates. Therefore Robert acted willfully within the meaning of the statute.

\*    \*    \*

Robert Peterson's claim against the United States is without merit and is dismissed with prejudice. Judgment is ordered to be entered in favor of the United States and against Robert Peterson in the sum of $41,336.40 plus statutory interest from and after November 24, 1986 to today's date.