**UNITED STATES of America, Plaintiff-Appellee and Cross-Appellant,**

v.

**INTERCONTINENTAL INDUSTRIES, INC., Defendant-Appellant and Cross-Appellee.**

Nos. 78–1519, 78–1520.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 18, 1980.

Decided Dec. 29, 1980.

Rehearing Denied Feb. 12, 1981.

Dean Carlton, The Carlton Firm, Dallas, Tex., for defendant-appellant and cross-appellee.

James K. Robinson, U. S. Atty., Detroit, Mich., M. Carr Ferguson, Asst. Atty. Gen., Gilbert Andrews, Jonathan S. Cohen, Timothy McBride, JoAnn Horn, Tax Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee and cross-appellant.

Before ENGEL and BROWN, Circuit Judges, and WISEMAN, District Judge.*

BAILEY BROWN, Circuit Judge.

This case presents cross appeals by the government and a taxpayer from a decision in the district court for the Eastern District of Michigan. The court, the Honorable John Feikens, sitting without a jury, found taxpayer Intercontinental Industries, Inc. (INI) liable for $62,598.95 in unpaid withholding taxes under 26 U.S.C. § 3505(b) (1976). The court refused, however, to impose approximately $30,000 in additional liability for prejudgment interest. The taxpayer has appealed from the decision imposing liability for unpaid taxes, and the government has appealed from the decision denying prejudgment interest. The district court's opinion on the question of INI's underlying liability is published at 499 F.Supp. 1133. The court's opinion on the

question of liability for prejudgment interest is reported at 449 F.Supp. 520.

## Facts

INI of Dallas, Texas, is a holding company with an interest in a number of diversified businesses. In May 1969, INI entered into an agreement with Prebuilt Homes, Inc. (Prebuilt), which needed assistance in the financing of a $12,000,000 contract to build 800 modular homes. The May 1969 agreement was the first major step in a process which would eventually have made Prebuilt a wholly owned subsidiary of INI. It provided that 81 percent of Prebuilt's issued and outstanding stock would be transferred to INI in exchange for stock of INI listed on the American Stock Exchange. In return, INI committed itself to obtain all of the operating funds needed by Prebuilt not otherwise obtainable, not to exceed $6,000,000.

INI began at once to fund Prebuilt's operating expenses. To implement their financing arrangement, a procedure was established by which the accounting department of Prebuilt would, on a weekly basis, determine the amount of operating funds needed for the following week which could not be obtained from other sources. These anticipated needs were communicated to INI either by telephone or in writing. INI then transferred the requested funds to Prebuilt's general account at the City National Bank in Detroit, and would receive thereafter daily expense reports from Prebuilt verifying that the funds had been used for the purposes requested. Under this arrangement, a total of $948,000 was transferred to Prebuilt during 1969 and 1970. In further satisfaction of its financing obligations under the May 1969 agreement, INI also arranged two loans of $350,000 each from the City National Bank of Detroit to Prebuilt in May and October of 1969. Prebuilt also received funds from other sources not connected with INI.

Shortly after the agreement had been signed INI issued a misleading announce-

---

* Honorable Thomas A. Wiseman, Jr., District Judge, United States District Court for the Mid-

dle District of Tennessee, sitting by designation.

ment to the financial community regarding Prebuilt's future earning potential. The price of INI's stock on the American Stock Exchange immediately soared. However, on August 9, 1969, following a hearing, INI's stock was "delisted" from the American Stock Exchange. This development prevented INI from fulfilling all of its obligations to Prebuilt under the May 1969 agreement.

Prebuilt was informed by the Federal Housing Administration (FHA) that none of Prebuilt's home construction loans would be guaranteed by the FHA as long as Prebuilt was associated with INI. These developments made it clear to the officers of both Prebuilt and INI that the two companies would have to disassociate, and in early August, 1969, a concerted effort was begun to find a successor to INI to assume Prebuilt's capitalization needs.

Nonetheless, INI continued to finance Prebuilt's operations with regular transfers of funds. After August 9, 1969, INI transferred more than $488,000 to Prebuilt for operating expenses, a substantial portion of which went to the payroll account. There was continuing contact between INI and Prebuilt during the latter half of 1969 which included almost daily telephone correspondence between officers of the two companies.

The parties were unsuccessful in finding a new buyer for Prebuilt. The company's operations gradually declined, and finally ceased altogether in January, 1970. Prebuilt went into bankruptcy in May, 1970.

From August 15, 1969 until May, 1970, when the company went out of business, Prebuilt failed to pay to the government any federal income or social security taxes for its employees. At the time it went bankrupt, Prebuilt had an unpaid tax liability of $169,920.93, including penalties and interest.

The IRS brought this action against INI, contending that INI was liable for a portion of the unpaid taxes of Prebuilt under 26 U.S.C. § 3505(b) (1976):

3505(b) **Personal Liability Where Funds Are Supplied.**—If a lender, surety, or other person supplies funds to or for the account of an employer for the specific purpose of paying wages of the employees of such employer, with actual notice or knowledge (within the meaning of section 6323(i)(1)) that such employer does not intend to or will not be able to make timely payment or deposit of the amounts of tax required by this subtitle to be deducted and withheld by such employer from such wages, such lender, surety, or other person shall be liable in his own person and estate to the United States in a sum equal to the taxes (together with interest) which are not paid over to the United States by such employer with respect to such wages. However, the liability of such lender, surety, or other person shall be limited to an amount equal to 25 percent of the amount so supplied to or for the account of such employer for such purpose.

The case was tried to the court sitting without a jury. The court found that INI not only knew of Prebuilt's decision not to pay withholding taxes after August 9, 1969, but INI actually made that decision for Prebuilt as a condition of further financing. The court further found that INI, through its president and its vice-president, informed Prebuilt's officers that after August 9, 1969, INI would continue to finance only those expenses which were absolutely necessary to maintain Prebuilt as a going concern until a successor to INI could be found, with the result that INI continued to finance Prebuilt's payroll only on a net basis.

The court found that of the $488,000 advanced to Prebuilt by INI after August 9, 1969, $250,395.78 had been advanced and was used for the payment of wages as to which INI knew that no withholding taxes would be collected or paid. In accordance with Section 3505(b) the court found INI liable for 25 percent of that amount, or $62,598.95. The court declined to find that INI was also liable for prejudgment interest, since that would have caused INI's liability to exceed the 25 percent limitation imposed by Section 3505(b).

Both INI and the government appealed. INI contends there was not substantial evidence to support the finding that INI advanced $250,395.78 to Prebuilt specifically for the payment of wages and that the funds were so used. The government argues that the district court erred as a matter of law in not requiring INI to pay prejudgment interest. For the reasons that follow we find both contentions to be without merit.

### Sufficiency of the Evidence

Section 3505(b) imposes liability for withholding taxes on a third party which supplies funds to an employer "for the specific purpose of paying wages," and the funds are so used, if the third party has reason to know the employer cannot or will not pay the withholding taxes. INI does not seriously contest the district court's finding that it had knowledge of Prebuilt's failure to pay the withholding taxes in question. The district court correctly found, on the basis of overwhelming and uncontradicted evidence (App. 28, 30, 43, 47, 126–127, 140), that INI not only knew of Prebuilt's failure to pay the taxes, but that INI actually made the decision not to pay. Furthermore, INI does not deny that at least some of the funds it supplied to Prebuilt were used to pay wages.

The question of whether INI supplied funds specifically for the payment of wages, and if so, in what amount, is a question of fact to be found by the court. The district court's findings may not be set aside on review unless they are clearly erroneous. *Commissioner v. Duberstein*, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960).

The district court found that INI supplied $250,395.78 to Prebuilt for the payment of wages. The financing arrangements between Prebuilt and INI were extremely informal. Prebuilt would inform INI on a daily or weekly basis, either by telephone or in writing, about its cash needs. INI would then send a check to Prebuilt to cover the expenses. Generally the check would not be for the full amount requested by Prebuilt. It is clear that INI was aware of Prebuilt's payroll needs and was aware that monies it was supplying were being used to meet those needs. (App. 28, 45–47). One example of this knowledge is a letter of November 21, 1969 from Mort Zimmerman of INI to Paul Corp of Prebuilt. (Exh. 12).

Dear Paul:

There is enclosed herewith a check in the amount of $22,000 as an additional advance to Pre/Built Homes, Inc. pursuant to the continuous financing required. As per our telephone conversation, this advance is being made for the primary purpose of covering labor salaries for the week ending 11/21/69.

The record amply demonstrates that INI had a good idea what the funds it was supplying to Prebuilt on a regular basis were being used for, even if INI did not know precisely what Prebuilt was doing with each nickel.

INI argues that there are two reasons why it has no liability for Prebuilt's unpaid withholding taxes. The first argument is that even though some of the funds INI was supplying to Prebuilt were being used to pay wages, INI was not making loans for the specific purpose of paying wages but was only making ordinary working capital loans. INI relies on the Senate Finance Committee Report, S.Rep.No. 1708, 89th Cong., 2d Sess., p. 23 (1966 Cum.Bull. 876, 892), which says that in order for a lender to have liability under Section 3505(b):

the lender, etc., must know that the funds he advances are to be used specifically for the payment of wages. This does not include an ordinary working capital loan even though the lender, etc., knows that part of the funds may be used to make wage payments in the ordinary course of business.

■ We do not agree that the loans INI made to Prebuilt were ordinary working capital loans within the meaning of the statement quoted above. We agree with the government that the cautionary language about working capital loans applies to the normal commercial setting where a business arranges an approved line of credit from a bank or other lender which could

expect, in the ordinary course of business, that some of the funds supplied might be used for wages. Ordinary working capital loans, at least for the purposes of Section 3505(b), do not include a lending arrangement of the type INI had with Prebuilt. INI received daily or weekly requests for funds from Prebuilt, and was told in great detail how the requested funds would be used. Furthermore, INI exercised significant control over the funds, often telling Prebuilt which bills to pay and which to leave unpaid. INI actually made the decision that Prebuilt would stop paying withholding taxes. We do not believe that this is the type of lending arrangement Congress had in mind when it stated that working capital loans did not come within the ambit of Section 3505(b).

Furthermore, even if we did believe the loans INI made to Prebuilt were ordinary working capital loans, that would not, in and of itself, insulate INI from liability. Treasury Regulation 31.3505–1(b)(3), 26 C.F.R. § 31.3505–1(b)(3), addresses the question of when the supplier of a working capital loan will face liability under Section 3505(b). The regulation states that even if the loan is not specifically for the purpose of paying wages,

> section 3505(b) is applicable where the person supplying the funds has actual notice or knowledge (within the meaning of section 6323(i)(1)) at the time of the advance that the funds, *or a portion thereof*, are to be used specifically to pay net wages, whether or not the written agreement under which the funds are advanced states a different purpose. Whether or not a lender has actual notice or knowledge that the funds are to be used to pay net wages, or merely that the funds may be so used, depends upon the facts and circumstances of each case. (emphasis supplied).

It is clear from the facts and circumstances of this case that INI knew a portion of the funds it supplied to Prebuilt would be used for the specific purpose of paying net wages. INI knew both that Prebuilt was using funds received from INI to pay wages, and that Prebuilt was not paying the required withholding taxes. Accordingly, we hold that INI is subject to liability under Section 3505(b) for the unpaid withholding taxes of Prebuilt.

We wish to be explicit about the grounds for our holding. We agree with the district court that the loans INI made to Prebuilt were not ordinary working capital loans but were loans for, among other things, the specific purpose of paying wages of the employees of Prebuilt, made with actual knowledge that Prebuilt did not intend to make timely payment of the required withholding taxes. Therefore, INI is liable under the explicit terms of Section 3505(b). Alternatively, even if we were convinced that the loans INI made were simply working capital loans, liability would attach under Treas.Reg. § 31.3505–1(b)(3), because INI had actual knowledge at the time the funds were advanced that a portion of the funds would be used for the specific purpose of paying net wages.

INI's second argument is that the government has not sustained its burden of proof and has failed to establish that INI gave *specific* amounts to Prebuilt for the *specific* purpose of paying wages, as INI argues is required by the statute. Since Prebuilt was receiving funds from several sources, including INI, all of which were going into the general account, and since no funds from INI were ever designated specifically for payroll, it is, according to INI, impossible for the government to attribute specific amounts to INI.

■ In other words, INI's position is that there can be no liability under Section 3505(b) unless the lender explicitly specifies the exact amount being advanced for net wages. We reject this position. There is nothing in Section 3505(b) requiring that degree of exactitude. The statute provides only that funds must be supplied for the specific purpose of paying wages. It does not provide that funds must be supplied *only* for the purpose of paying wages and nothing else, nor does it provide that any or all of the amounts supplied must be specifically designated "for the payment of

wages." *See, United States v. Park Cities Bank & Trust Co.*, 481 F.2d 738 (5th Cir. 1973) (bank had liability under § 3505(b) when it made loans to employer and employer deposited part of amounts loaned in payroll account). In an attempt to avoid liability INI asks this court to read an additional requirement into the statute that would make it virtually impossible for the government to prove a case under Section 3505(b). According to INI, unless a loan was designated by the lender "for payroll" it would not be for the specific purpose of paying wages. This would allow any lender to avoid liability by making loans to the general account and letting the borrower transfer as much of the proceeds as necessary to payroll. We hold that in order for the government to prove a case under Section 3505(b) it is only necessary for the government to show that a lender advanced funds to an employer with knowledge that some or all of the funds will be used to pay net wages. It is not necessary for the government to prove the lender knew in advance the exact amounts that were to be used for wages. Of course, in establishing the amount of liability the government must prove what amounts advanced by the lender were actually used for net wages.

■ The next question is whether the district court correctly determined the amount of INI funds Prebuilt used for the payment of net wages. Finding the exact amount of INI funds used for wages is a difficult task because, as the district court noted, most of Prebuilt's requests for money were transferred by telephone and the itemized records of INI and Prebuilt were either lost or destroyed and were, therefore, unavailable. However, while the task may be difficult it is not impossible, and we find the district court correctly determined that of the total amount INI supplied to Prebuilt, $250,395.78 was used by Prebuilt for the payment of wages.

Prebuilt received funds from several sources, although INI was the single largest supplier of money. As a rule Prebuilt deposited all funds in its general account and funded its payroll account from the general account. As a result, funds from INI were commingled in the general account with funds Prebuilt received from other sources. In order to determine which INI funds were used for payroll it was necessary to trace the funds through the general account to the payroll account. The district court accepted the conclusions of the government's expert witness, Robert Campbell, concerning the amount of INI funds that ended up in Prebuilt's payroll account. The court was not clearly erroneous in accepting these conclusions.

When INI loans were received by Prebuilt they were deposited in the general account. The government used a last-in-first-out (LIFO) method to determine whether any INI funds were included in the transfers from the general account to the payroll account. Since it was necessary to trace the funds, some accounting method had to be used, the alternatives being LIFO or FIFO. INI simply argues that it is impossible to tell which funds went to payroll since the funds were commingled in the general account. This argument appears to be a rejection of all accounting methods and is patently meritless. INI offers no reason why the district court should not have accepted the government's use of LIFO in tracing the funds. LIFO is an accepted accounting method and its use was appropriate here.

The tracing method is explained in great detail in the district court's opinion at 499 F.Supp. 1133. In addition, the transactions summarized below are explained individually. Since the district court's findings are correct we only summarize them here.

The district court attributed a total of twelve payroll deposits to INI. In one instance an INI loan of $15,000 was deposited directly in the payroll account, which made tracing unnecessary. In nine instances INI loans were deposited in the general account on days when no funds from other sources were deposited in the general account, and transfers to the payroll account were made the same day. These transfers were attributed to INI, up to the amount of the INI loan deposited that day, in keeping with the

LIFO tracing method. These deposits total $160,032.10.

The eleventh payroll deposit attributed to INI was in the amount of $5,676.29. On November 17, 1969 an INI loan of $30,000 was deposited in the general account. On November 18, 1969 funds from another source totaling $7,784.72 were deposited in the general account. On November 20, 1969 a transfer of $13,461.01 was made from the general account to payroll. In accordance with LIFO principles only $5,676.29 of this amount was attributed to INI.

The final payroll deposit attributed to INI was a deposit of $11,505.06 on October 13, 1969. This amount is directly traceable to a loan of the same date. However, the loan of October 13, 1969 was not a direct loan from INI but was a $350,000 loan from City National Bank of Detroit. Section 3505(b) imposes liability not only on a lender who supplies funds but also on a surety who supplies funds. INI was a surety on the CNB loan to Prebuilt. INI negotiated the loan and supplied collateral to CNB worth more than twice the amount of the CNB loan. It is clear that although CNB provided the funds, INI was the supplier within the meaning of Section 3505(b). Therefore, the $11,505.06 payroll deposit is properly attributable to INI.

The district court also attributed a final January 1, 1970 INI loan of $58,182.83 to payroll. This loan was not deposited in the payroll account. However, this amount was attributed to payroll on the basis of an adjusting entry in Prebuilt's accounts on January 31, 1970 indicating that these funds were applied to decrease accrued payroll. There was a sufficient basis for the district court to make this determination and the finding is not clearly erroneous. The district court correctly found that INI

supplied a total of $250,395.78 to Prebuilt for the payment of wages.

## 25 Percent Limitation on Liability

The sole issue presented by the government's appeal is whether the 25 percent limitation on liability in Section 3505(b) applies only to liability for unpaid withholding taxes, or whether it applies to total liability for taxes and prejudgment interest. The government's position here, and in the district court, is that the 25 percent limitation applies only to liability for taxes, and is not a limitation on total liability. Therefore, prejudgment interest should be imposed, even if it causes total liability for taxes and interest to exceed 25 percent of the amount supplied. The relevant part of Section 3505(b) reads:

> [S]uch lender ... shall be liable ... to the United States in a sum equal to the taxes (together with interest) which are not paid over to the United States .... However, the liability of such lender ... shall be limited to an amount equal to 25 percent of the amount so supplied ....

The government bases its position in large part on Section 31.3505–1(b) of the Treasury Regulations. The regulation initially tracks the statutory language and then gives examples.[1] The government relies heavily on the phrase "plus interest thereon" at the end of the example in the regulation to buttress its conclusion that the 25 percent limitation is for taxes only.

The district court held the plain meaning of Section 3505(b) limits total liability for taxes and interest to 25 percent of the amount supplied. If the statute is construed as placing a 25 percent limitation on total liability the regulation conflicts with the statute, if the regulation is interpreted as the government urges. Rather than find the regulation invalid (the necessary corollary of a conflict between the statute and

---

1.  (2) Examples ...

    (1) D, a savings and loan association, advances $10,000 to Y for the specific purpose of paying the net wages of Y's employees. D advances those funds with knowledge that Y will not be able to make timely payment of the taxes required to be deducted and withheld from those wages by subtitle C of the

    Code. Y uses the $10,000 to pay the net wages of his employees but fails to remit withholding taxes due under subtitle C in the amount of $2,600. D's liability, under this section, is limited to $2,500, 25% of the amount supplied for the payment of wages to Y's employees, plus interest thereon.

regulation) the district court interpreted the phrase "plus interest thereon" in the regulation to mean postjudgment interest. 449 F.Supp. 520, 523.

Only one court of appeals has interpreted this aspect of Section 3505(b). The Ninth Circuit in *United States v. Metro Construction Co., Inc.*, 602 F.2d 879 (9th Cir. 1979), dealt with the exact issue presented here: does the 25 percent limitation apply only to payroll taxes, or does it operate as a limit upon total liability, including taxes and prejudgment interest. There, as here, the government relied primarily on Treas.Reg. § 31.3505–1(b)(1), arguing the regulation compelled the finding that the 25 percent limitation did not limit prejudgment interest. The Ninth Circuit felt that both the statute and regulation were so ambiguous as to have no plain meaning. However, based on its interpretation of the statutory language it reached the same conclusions as did the district court in this case: the 25 percent limitation applies to total liability for taxes *and* prejudgment interest, and the phrase "plus interest thereon" in the regulation refers to postjudgment interest.

We agree with the district court that Section 3505(b) plainly limits total liability for taxes and prejudgment interest to 25 percent of the amount supplied for wages. We do not accept the interpretation of the regulation urged by the government since the regulation, in the light of the illustration, is ambiguous in this respect and since such interpretation would cause the regulation to contradict the statute. Rather, we adopt the district court's interpretation of the regulation and hold that the phrase "plus interest thereon" in the regulation applies to postjudgment interest. The district court correctly limited INI's liability to $62,598.95, which is 25 percent of the amount the court found INI supplied to Prebuilt for the payment of wages.

For the reasons stated above the decision of the district court is affirmed. No costs.