**UNITED STATES of America, Plaintiff,**

v.

**Joseph J. VACCARELLA, Security Pacific Business Credit, Inc. and Gary D. Zintgraff, Defendants.**

**No. IP 88–1120–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

April 24, 1990.

Douglas W. Snoeyenbos Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Robert Johnson, Krieg, DeVault, Alexander & Capehart, Indianapolis, Ind., for defendant Vaccarella.

Steven K. Huffer, Mitchell, Hurst, Jacobs & Dick, Indianapolis, Ind., for defendant Sec. Pacific.

Gary D. Zintgraff, Boerne, Tex., pro se.

## ENTRY

BARKER, District Judge.

In the present case, the United States (the "government") brought suit against the defendants to collect unpaid withheld federal income taxes due and owing from the Mystik Corporation ("Mystik") for the first, second, and fourth quarters of 1983. In March of 1987, a delegate of the Secretary of the Treasury made separate assessments against defendants Vaccarella (for $241,774.58 plus statutory interest) and Zintgraff ($241,774.58 plus statutory interest) pursuant to 26 U.S.C. § 6672, for their allegedly willful failure to collect, account for, and pay over unpaid withheld federal income taxes and social security taxes due and owing from Mystik Corporation. The Secretary entered a similar assessment against Security Pacific Business Credit, Inc. ("Security Pacific") for $241,588.70 plus statutory interest on August 5, 1987, and a separate assessment pursuant to 26 U.S.C. § 3505(b) in the amount of $123,009.50. Vaccarella has counterclaimed for

$3,443.97 plus interest, an amount due to him from a 1987 income tax refund which the Internal Revenue Service applied toward the assessment against Vaccarella instead of sending the return to him.

The case was tried to the court on March 19, 20, and 21, 1990. At trial the government conceded its claims against the defendants for the first and fourth quarters of 1983, and the case went forward only on the unpaid taxes for the second quarter of 1983. The parties have submitted post-trial briefs and proposed Findings of Fact and Conclusions of Law. The court, having considered the evidence adduced at trial and the admissible portions of the tendered depositions, as well as the briefs and arguments of counsel, hereby finds that judgment should be entered in favor of defendants Vaccarella and Zintgraff, and against defendant Security Pacific.

Before addressing the facts and law of the case, the court must rule on some evidentiary objections to deposition testimony proffered by the parties. Security Pacific offered into evidence the deposition testimony of Mr. Gerald L. Nieukirk of the Harris Bank (Plaintiff's Exhibit 185), and the government objected to the testimony on relevancy grounds. The testimony concerns the manner in which Harris Bank (where Mystik had an account) handled bounced checks. Although only minimally useful, this evidence is sufficiently related to the bounced payroll tax check in this case to satisfy Federal Rule of Evidence 401, and cannot be considered prejudicial to any party. Therefore, the government's objection is overruled, and Exhibit 185 is admitted into evidence.

Security Pacific has also proffered selected portions of the deposition testimony of Mr. Robert C. Bartkowicz, an officer at Security Pacific. The government's objects to page 85, lines 2 through 12, on the grounds that those lines have already been admitted into evidence, and the objection is sustained for that reason. The government further objects to page 82, lines 5 through 21, on relevancy grounds. Because that testimony relates to whether asset-based lenders frequently fund customers on the basis of the customer's bank overdrafts, and a great deal of evidence was presented in the trial concerning Security Pacific's funding of Mystik's overdrafts, the government's objection is overruled.

Finally, the government has eight objections to the portions of the Tamborello deposition sponsored by Security Pacific. Because the deposition is already part of the record, the court will rule on the objections without needlessly synopsizing the challenged passages.

* Lines 19 through 25 on page 174 are admitted, not to show the truth of the matters therein asserted, but to show Mr. Tamborello's perception of Mr. Kleiman's and Mr. Gray's attitudes toward the re-hiring of Campbell and Prescher.

* Lines 1 through 11 on page 175 are admitted; they are neither irrelevant nor speculatory.

* Lines 25 on page 177 through 10 on page 178 are not admissible because they are speculatory. Mr. Tamborello's suspicions regarding Mystik's or General Electric's knowledge of the inventory drop have no foundation, and in any event are irrelevant to any of the issues proveable in this case.

* Lines 3 through 8 on page 179 are not admissible because they lack a foundation.

* Lines 12 through 25 on page 180 are admitted. (If the court excluded all the testimony in this case that was not directly responsive to the questioning, the transcript would be half its present size.)

* Lines 1 through 25 on page 181 are admitted; the government's objections go to the weight rather than the admissibility of this evidence.

* Lines 1 through 9 on page 182, though only marginally relevant, are admissible, as the court has already heard a lot of evidence pertaining to Zintgraff's attempts (or lack thereof) to sell Mystik.

* Lines 16 through 25 on page 183 are admitted because they pertain to the

business relations between Mystik and Security Pacific, and to the degree of control exercised over Mystik by Security Pacific. The weight of the evidence, of course, is diminished to the extent that it may be speculative.

The court notes that this is not a "close case," and that the challenged testimony ruled on above, whether admitted or excluded, did not have a decisive impact on the disposition of this case.

## FINDINGS OF FACT

1. Defendant Zintgraff founded Chemical Investors, Inc., in 1976. The Mystik Corporation ("Mystik") was a wholly-owned subsidiary of Chemical Investors, formed to acquire the assets of the Mystik Tape Division of Borden, Incorporated. In 1980, Chemical Investors purchased Mystik Tape in a highly leveraged transaction. Borden retained a significant secured interest in Mystik, but the bulk of the deal was financed by General Electric Credit Corp. ("GE"), an asset-based lender.

2. Zintgraff was the largest single shareholder of Chemical Investors, and was Chairman of the Board of Directors of both Chemical Investors and Mystik. He was also the Chief Executive Officer of Mystik.

3. In 1982, Security Pacific replaced General Electric as Mystik's asset-based lender. Security Pacific's loans were collateralized by security interests in Mystik's accounts receivable, chattel paper, contract rights, raw materials, works in progress, inventory, goods, equipment, vehicles, fixtures, general intangibles, and real estate.

4. Mystik had a "lockbox" arrangement with Security Pacific, whereby Mystik's accounts receivable were sent directly from Mystik's customers to the lockbox account in Harris Bank, which only Security Pacific could access. Often, however, customers would mistakenly send checks directly to Mystik. When this happened, Mystik always forwarded the checks to the lockbox.

5. Mystik had some foreign customers whose checks could not be cleared through the lockbox. Mr. Smetana of Security Pacific testified that in late May of 1983, Mystik received a check in the $30,000-

$40,000 range from an Australian customer; this check went directly to Mystik's operating account, but "some" of it was transfered to the lockbox after Security Pacific expressed its displeasure. Smetana also stated that some "small" foreign checks may also have gone directly into Mystik's operating account.

6. Smetana was the Security Pacific account executive primarily responsible for the day to day contacts with Mystik. His superior, Mr. Tamborello, was the Security Pacific officer with ultimate authority over the Mystik account.

7. In late January or early February of 1983, Mr. Vaccarella became the Treasurer of Mystik. Vaccarello had no previous experience dealing with asset-based lenders. He was neither a stockholder nor a Board member of either Chemical Investors or Mystik.

8. Both Vaccarella and Zintgraff had signature authority over all Mystik checking accounts.

9. In January of 1983, an audit revealed an unexpected drop in Mystik's inventory; this shortage was later attributed to theft. As a result of this loss of inventory, Security Pacific became under collateralized. Prior to this time, Mystik had never been "overline" on its loan with Security Pacific.

10. On February 10, 1983, Security Pacific notified Mystik that Mystik was in default on the loan agreement, and that Security Pacific was no longer obliged to advance funds to Mystik. Nevertheless, Security Pacific continued to fund Mystik on a regular basis.

11. After the inventory drop, personnel from Mystik and Security met to discuss ways to resolve the new problems. The question of re-financing Mystik was bruited, and Tamborello gave "marching orders" to Mystik officers to work their way out of the situation. Zintgraff moved into offices at Mystik to be on-hand during the crisis, and from this point on, Security Pacific's presence at Mystik facilities increased.

12. In February of 1983, Security Pacific took assignments of Mystik's patents

and trademarks, and in March took assignments of Mystik's government contracts.

13. Mystik's plan for recovery from its overline position was ultimately unsuccessful, and by April of 1983, Mystik was more than $1 million overline.

14. By April, Smetana was working in the Mystik offices two to three times each week, and five or six Security Pacific auditors were also spending substantial amounts of time at Mystik. Mr. Lansangan, Mystik's Senior Accountant, testified that, by comparison, he had seen a Security Pacific auditor on Mystik premises only once in all of 1982.

15. From April through June 9, 1983, Mystik maintained an operating account, an executive payroll, and an hourly payroll account at Harris Bank and Trust. During this period, Security Pacific wire transferred funds to the operating account every business day or every other business day. Prior to May 23, 1983, amounts necessary to cover checks presented on the two payroll accounts were automatically transferred by the Bank from the operating account to the payroll accounts as needed.

16. Beginning on or about April 19, 1983, Security Pacific began funding Mystik's daily overdrafts in the checking accounts at Harris. Harris would honor the checks presented for payment each day, but this usually resulted in an overdraft. The overdraft, however, would be made good by the next morning's wire transfer from Security Pacific.

17. Mr. Lansangan, the Senior Accountant at Mystik, prepared daily "certificates" for Security Pacific. These certificates detailed Mystik's receivables and inventory collateral, and were designed to keep Security Pacific informed as to its collateral position. Mystik based its requests for funding on these reports. In 1982 and early 1983, Mystik specified neither precise amounts nor specific creditors to whom the funds would be forwarded. Instead, Lansangan simply requested a "lump sum" from which he would make payments.

18. After Security Pacific's decision to fund overdrafts, however, Lansangan was required to prepare, on a daily basis, lists detailing Mystik's anticipated expenses for the day. The list identified individual creditors and the exact amount Mystik intended to send to each, whether for past debt owed or for present purchases of raw material for production. The list was prepared within Mystik, and Lansangan conveyed it to Smetana at Security Pacific by telephone.

19. Smetana exercised a veto power over the items of Mystik's list, deciding which expenses would be paid and which would not. In this way Smetana prioritized the creditors Security Pacific wished to pay. If Security Pacific did not approve an expense, Mystik could not pay it.

20. Security Pacific's targeting of Mystik creditors for payment had a significant, and often determinative, impact on Mystik's day to day business decisions. Security Pacific's choices of which costs to fund often made little business sense to Mystik's personnel. Often Mr. Prescher (Mystik's President) would contact Smetana to ask that the funding be re-allocated; Smetana sometimes complied with such requests.

21. As Mystik's financial situation continued to deteriorate, a divergence appeared between Mystik's and Security Pacific's respective interests. (Deposition of Mr. Campbell, pp. 84–85; testimony of Mr. Zintgraff). Mystik's funding priorities reflected an intent to maintain Mystik as a going concern, whereas Security Pacific was more interested in converting the works-in-progress and inventory into finished product, which would be easier to liquidate if Mystik went under. Mr. Prescher stated that Security Pacific's funding decisions were "not based on logic from a manufacturing standpoint. From our standpoint [the decisions were] based on logic for Security Pacific to lower their risk." (Prescher deposition, pp. 43–44).

22. Because it controlled the pursestrings through its veto power over Mystik's expenses, Security Pacific's agenda prevailed. Security Pacific's control over which products it wished Mystik to produce was manifested in the choices of raw materials that it authorized Mystik to procure.

In this way, Security Pacific came to exert a pervasive influence on Mystik's management and production decisions.

23. In April of 1983, Zintgraff and Tamborello had a "very detailed meeting" at which Tamborello indicated that Mystik's overall payroll had to be cut. Security Pacific directed that all Mystik's departments except Accounting would be affected. Security Pacific did not specify which individuals should be fired.

24. Throughout April and into May of 1983, Security Pacific became increasingly concerned about the continuing collateral depreciation. On May 6, 1983, Mr. Tamborello sent a letter to Mr. Zintgraff stating that on May 19, 1983, funding would be cut off unless Mystik had made substantial progress in negotiating a sale of Mystik. Mystik personnel described this as the "drop dead" letter.

25. Zintgraff, who had never been involved in Mystik's daily requests for funding or in choosing which creditors should or should not be paid, now devoted all of his attention to seeking additional capital for Mystik. Zintgraff was more interested in re-financing Mystik than in selling it, but in either case his efforts were hampered by Mystik's lack of audited "financials." Mystik lacked these "financials" because Security Pacific refused to pay an auditor for them.

26. On May 19, 1983, Security Pacific did not advance any funds to Mystik's accounts. Consequently, Harris Bank returned a number of Mystik's checks to the presenters unpaid. The total value of the checks which bounced was roughly $200,-000. Among those checks was a check for federal withholding taxes (check no. 5157) in the amount of $58,333.37.

27. Upon learning about the bouncing checks, Lansangan telephoned Smetana, told him that one of the dishonored checks was the payroll tax check, and discussed the possibility of "making good" that check. Smetana responded that the matter was now "over [his] head" at Security Pacific, and he did not know how funding decisions would be made in the future.

Lansangan also told Vaccarella about the bounced payroll tax check.

28. Vaccarella personally discussed the bounced payroll tax check with Smetana, and on May 23, 1983, mailed Smetana a letter detailing their conversation. These communications, along with Lansangan's, made Security Pacific aware that the federal payroll withholding tax check had bounced. Security Pacific was also aware that Mystik had no sources other than Security Pacific from which funds could be raised to pay the federal tax. Mystik could not simply re-deposit the payroll tax check; the expense had to first be approved by Security Pacific. Moreover, Mystik did not subsequently re-submit the unpaid payroll tax as a proposed expense in its daily requests for funding, because it believed the issue was being handled at higher echelons in Security Pacific.

29. After physically receiving the bounced payroll tax check from Harris Bank, Lansangan again spoke with Smetana about how to handle the situation. Smetana replied that Security Pacific had decided to fund only net payroll, not gross payroll. Prior to this statement, Security Pacific had always funded gross payroll; after Mystik declared bankruptcy, Security Pacific again funded gross payroll. It bears repeating that when Security Pacific decided to fund only net payroll, it knew that Mystik could not get the funds to pay its federal withholding tax from any other source.

30. On May 20, 1983, Security Pacific resumed advancing funds to Mystik, and continued to advance funds to Mystik through July of 1983.

31. Beginning on May 23, 1983, Security Pacific began wire-transferring money directly into Mystik's Executive Payroll and Hourly Payroll accounts; this was contrary to Security Pacific's normal policy of advancing funds only to operating accounts. In his deposition, Mr. Bartkowicz of Security Pacific admitted that he could not think of any justification for advancing funds directly to the payroll accounts. (Bartkowicz deposition, pp. 37–38). Mr. Tamborello of Security Pacific further con-

ceded that asset-based lenders, as a rule, did not directly fund payroll accounts because doing so would incur tax liability.[1] Thus Security Pacific knew directly funding payrolls was ill-advised.

32. Between May 23, 1983, and June 8, 1983, Security Pacific advanced $204,362.17 directly to Mystik payroll accounts at Harris Bank. During the same time frame, Security Pacific advanced $621,008.47 to ear-marked creditors through Mystik's operating account.

33. Sometime in June, Vacarella took over from Lansangan the duty of making daily funding request calls to Security Pacific. Around the same time, Tamborello asked Vacarella to prepare daily "wish-lists," designating specific payees and the amounts requested for them. No "wish-list" survives from the pre-bankruptcy period, but this is because they were conveyed verbally rather than in writing. (Bartkowicz deposition, pp. 33; 62). Again, Security Pacific exercised a veto power over the items of these lists.

34. On or about June 10, 1983, Mystik opened new executive and hourly payroll accounts at the Bank of Northfield. A Mystik operating account at the Bank of Northfield had already been opened.

35. Between June 11, 1983, and June 28, 1983, inclusive, Security Pacific advanced $287,675.84 through Mystik's operating account at the Bank of Northfield to Mystik's payroll accounts at the Bank of Northfield. Thus from May 23, 1983, to June 29, 1983, Security Pacific wire-transferred a total of $492,038.01 to Mystik for the purpose of paying wages to Mystik employees.

36. Between May 18, 1983, and June 29, 1983, Mystik made no federal withholding tax payments. The amount of income and FICA taxes withheld from the wages of Mystik employees during this time and not

paid over to the government was $241,588.70.

37. Security Pacific wanted to keep Mystik employees on the job because this would make the business look more appealing to companies interested in purchasing Mystik.

38. On May 24, May 26, and June 29 of 1983, Security Pacific wire-transferred funds directly to the account of the law firm of Dann, Pecar, Newman, Telesmick, and Kleiman, P.C., a creditor of Mystik.

39. On or about June 22, 1983, as Mystik was beginning to unravel, Zintgraff fired both Prescher and Campbell, the President and Vice–President of Mystik, respectively. Security Pacific was upset at this move, because it is difficult to sell a company bereft of its top management. Tamborello went so far as to retain a lawyer to represent Prescher and Campbell in a potential wrongful discharge action. Tamborello also conveyed to Mr. Gray, an attorney and member of Mystik's Board of Directors, that no Mystik employees would get their pay-checks unless Prescher and Campbell were re-hired. In light of the funding cut-off of May 19, 1983, Mystik did not perceive this to be an idle threat.

40. On June 27, 1983, under strong pressure from Security Pacific, both Prescher and Campbell were re-hired a few days after they had been fired. Zintgraff testified that the rehiring was "crammed down our throats." This kind of control by Security Pacific led Mystik personnel to believe that Tamborello, not Zintgraff, was now running Mystik's business.

41. On June 28, 1983, representatives from Mystik and Security Pacific met to discuss Mystik's impending bankruptcy. At this meeting, the issue of the unpaid federal withholding taxes was raised by Mr. Gray of Mystik. The Security Pacific

---

1. Tamborello: Now, it we funded into a payroll account, that was a strategic error, bad error, on Security Pacific's part I must say. We never fund into a payroll account. It's policy.
Q. Why? What's the reason for that policy?
A. Liability, tax liability.
Q. Unpaid federal withholding tax liability?
A. That's correct.

Q. So if Security Pacific did fund directly into Mystik's payroll account, that would be a violation of Security Pacific's business policy. Is that correct?
A. ... Our counsel, both inside and outside counsel, recommended strongly that no lender fund into a payroll account.
Tamborello deposition, p. 72.

personnel seemed aware of the problem, and were not surprised by the inquiry.

42. Responding to the question about the unpaid withholding taxes, Tamborella stated that he knew that Security Pacific had the obligation to pay the taxes, but that he would not pay them unless and until the Internal Revenue Service came after him and "tapped him on the shoulder."

43. Mystik filed a bankruptcy petition on June 29, 1983. From this point on, Mystik kept current with its withholding tax obligations.

44. Any conclusion of law stated below, to the extent that it constitutes a finding of fact, is herein incorporated by reference as an additional finding of fact by the court.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over this action pursuant to 26 U.S.C. §§ 7402(a) and 6672, and 28 U.S.C. §§ 1340, 1345, and 1346.

2. Sections 3102(a) and 3402(a) of the Internal Revenue Code (the "Code") require an employer to deduct and withhold income and social security taxes from the wages paid to its employees. Section 7501 of the Code provides that "the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States." These withheld funds are "for the exclusive use of the United States and are not to be used to pay the employer's business expenses, including salaries, or for any other purpose."
*Graunke v. United States*, 711 F.Supp. 388, 391 (N.D.Ill.1989).

3. Section 6672 of the Code provides that "any person required to collect, truthfully account for, and pay over any tax ... who willfully fails to collect such tax, or truthfully account for and pay over such tax ..." shall be personally liable to the United States for the full amount of the withholding taxes not collected or paid over. Section 6671(a) provides that the "100–percent penalty" liability shall be assessed and collected in the same manner as taxes.

4. Therefore, once the government has obtained a single satisfaction, it will abate all remaining liabilities related to the same payroll tax liability.

■ 5. Federal tax assessments are deemed to be correct; the person against whom an assessment is made bears the burden of proving by a preponderance of the evidence that he is not liable for the taxes sought to be collected. *Ruth v. United States*, 823 F.2d 1091, 1092–93 (7th Cir.1987).

■ 6. For a person to be liable under section 6672, two elements must be satisfied:

(1) the person must have been required to collect, truthfully account for, and pay over the employment taxes; and

(2) the person must have willfully failed to collect and pay over the taxes

*Monday v. United States*, 421 F.2d 1210, 1216 (7th Cir.), *cert. denied*, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970). The first prong of this test is often referred to as determining whether one is a "responsible person."

[3] 7. The Seventh Circuit has held that the "key to liability" under section 6672 is the:

"control of finances within the employer corporation: the power to control the decision-making process by which the employer corporation allocates funds to other creditors in preference to its withholding tax obligations." *Haffa v. United States*, 516 F.2d 931, 936 (7th Cir. 1975). It is sufficient that the person involved have significant control over the disbursal of corporate funds. *Adams v. United States*, 504 F.2d 73, 75 (7th Cir. 1974). Section 6672 is broad enough to "reach [any] entity [including an outside lender] which assumes the function of determining whether or not the employer will pay over taxes withheld from its employees." *Id.* at 76. (brackets in the original).

*Purdy Co. of Illinois v. United States*, 814 F.2d 1183, 1188 (7th Cir.1987). While corporate officers are certainly within the purview of section 6672, one's status as a

corporate officer, or even as a CEO, does not *per se* make one a "responsible person." *Monday v. United States*, 421 F.2d at 1214.

8. Determining whether one is a "responsible person" is a fact-sensitive inquiry. Courts look beyond official corporate titles to the actual mechanics of the decision-making process. *See Slodov v. United States*, 436 U.S. 238, 254, 98 S.Ct. 1778, 1788, 56 L.Ed.2d 251 (1978); *Godfrey v. United States*, 748 F.2d 1568, 1575 (Fed. Cir.1984); *Monday v. United States, supra.*

9. Liability under section 6672 is not limited to the person with the most control over the disbursement of funds, but rather encompasses all persons having significant control over the disbursal. *Adams v. United States*, 504 F.2d at 75–76; *Monday v. United States*, 421 F.2d at 1214. The court realizes that a finding that one person is a "responsible" person does not preclude others from also being "responsible," and thus liable. *Cf. Muntwyler v. United States*, 703 F.2d 1030, 1032 (7th Cir.1983).

10. Nevertheless, in the present case only Security Pacific can be deemed a "responsible person" within the ambit of section 6672, because only Security Pacific had significant control over Mystik's finances. By late May of 1983, neither Vaccarella nor Zintgraff effectively had any power to control the decision-making process with respect to allocating funds among creditors. *See Sawyer v. United States*, 831 F.2d 755, 758 (7th Cir.1987); *Purdy Co., supra*, 814 F.2d at 1188. Se-

curity Pacific had complete control over Mystik's finances through the lock-box system and its veto power over funding requests. It was Security Pacific, not Zintgraff or Vaccarella, who directed payments to be made to other creditors in preference to paying the United States government. Moreover, Security Pacific choices of which creditors to pay reflected priorities calculated to protect its own collateral position with Mystik; often these choices ran counter to the best interests of Mystik itself.

And while it was still physically possible for Mystik to redirect money that Security Pacific had advanced to cover other specific expenses, this court would have to ignore the obvious dynamics of the Mystik—Security Pacific relationship to hold that this fact made either Vaccarella or Zintgraff a "responsible person." As Security Pacific was well aware, Mystik had no source other than Security Pacific from which to get funds to pay the withholding tax.[2] Mystik's continued existence depended on Security Pacific's transfusions of money, so Mystik was in no position to directly contravene Security Pacific's marching orders with respect to disbursements. Indeed, Vaccarella testified that he thought that Security Pacific would cut off all funding had Mystik dared to disburse funds to anyone other than those creditors targeted by Security Pacific.[3]

11. Although Vaccarella was Mystik's Treasurer, and was responsible for formulating Mystik's requests for funding, his control over Mystik's finances was titular rather than functional. His control cannot be deemed "significant" enough to warrant

---

**2.** Evidence discussed *supra* indicated that foreign creditors sent checks directly to Mystik rather than to the lock-box. In particular, a payment for roughly $30,000 from an Australian creditor in late May or early June, 1983, was noted. Under cross-examination, Mr. Smetana of Security Pacific conceded that "some" portion of this check was ultimately forwarded to Security Pacific. Reading the record as a whole, however, the inference that Mystik had direct control of funds with which it could have paid the federal withholding tax is too speculative.

**3.** Vaccarella or Zintgraff could have re-submitted the unpaid payroll tax as an expense

item to be funded by Security Pacific; their failure to do so, however, does not make them liable. They reasonably believed that the issue was being handled at Security Pacific in circles higher than those concerned with Mystik's daily funding requests. Further, the court does not exonerate these defendants because they were "acting under orders"; a Nuremberg defense would be unavailing. *Cf. Roth v. United States*, 779 F.2d 1567, 1572 (11th Cir.1986). The crux is that neither Zintgraff nor Vaccarella had significant control over the disbursement decisions, not that they had such control but were afraid to use it.

liability under section 6672. *Cf. Adams v. United States*, 504 F.2d at 75. Similarly, Zintgraff's control over the disbursal of funds was insufficient to justify liability. Though he could not escape liability by not being involved in the daily funding contacts with Security Pacific, or by delegating such responsibilities, *Thomsen v. United States*, 887 F.2d 12 (1st Cir.1989), Zintgraff was powerless to countermand Security Pacific's disbursement decisions.[4]

12. Section 6672 has been "widely interpreted to make liable those persons who are so connected with a business as to be in a position to exercise full authority over financial affairs." *Platt v. United States*, 519 F.Supp. 203, 208 (N.D.Ill.1981) (citing *Haffa v. United States*, 516 F.2d 931 (7th Cir.1975) and *Adams v. United States, supra*). Given Security Pacific's complete control of Mystik's finances, neither Zintgraff nor Vaccarella could have exercised significant authority. And Security Pacific did not stop at controlling Mystik's finances; its control extended to deciding which raw materials to purchase and which products to produce, directing Mystik to lay-off employees (even specifying the departments to be affected), and even to coercing Zintgraff to re-hire corporate officers he had fired.

13. The court understands that corporate officers are among the "usual suspects" for section 6672 liability. In the present case, however, both Zintgraff and Vaccarella have proved by a preponderance of all the evidence that they neither exercised significant control over Mystik's finances, nor had any role in preferring other creditors to the United States. To hold in this case that Zintgraff and Vaccarella are liable as "responsible persons" is tantamount to imposing liability on the basis of their official positions alone, without regard to all the other relevant factors which underlie the requirement of a trial from which a factfinder must distill such conclusions. The statute under which this determination of "responsible person" is to be made is not that broad.

The court acknowledges the Second Circuit's recent decision holding a company treasurer liable under section 6672 in analogous circumstances. *See Hochstein v. United States*, 900 F.2d 543 (2nd Cir.1990). In certain respects, that case can be distinguished on its facts, but even if not distinguishable on that basis, and with all due respect, this court declines to follow that decision, finding Judge Newman's dissent the more persuasive treatment of those facts and the applicable law. In focusing on the treasurer's physical ability to re-direct payments from a lender, the majority in *Hochstein* gave short shrift to the realities of the situation, *Cf. Slodov v. United States*, 436 U.S. at 254, 98 S.Ct. at 1788, and in effect held the treasurer liable because, hypothetically, he *could* have exercised some control over the disbursal decisions. Significant control is a matter of substance, not form, and this court will not view Vaccarella's duties in a vacuum, divorced from the actual dynamics of the Security Pacific—Mystik relationship. It is the "*effective* power to pay," not the hypothetical power to pay, that governs the section 6672 liability. *Howard v. United States*, 711 F.2d 729, 734 (5th Cir.1983) (emphasis in original). Moreover, the Seventh Circuit has clearly directed that the "key to liability" under section 6672 is predicated on "control of the decision-making process by which the employer corporation allocates funds to other creditors in preference to the United States." *Purdy*, 814 F.2d at 1188. The approach advocated by the government, and adopted by the Second Circuit, casts the wide net of section 6672 liability too indiscriminately, without due regard for the factual underpinnings of "significant control." Because in the present case both Zintgraff and Vaccarella have proven by a preponderance of the evidence that they did not have significant control, they are not "responsible" persons under section 6672, and are therefore enti-

---

4. For the same reason, the fact that both Zintgraff and Vaccarella had nominal check-signing authority cannot alone establish that they were "responsible" persons.

tled to judgment in their favor.[5] As Judge Newman wrote, "[t]he Government should collect its taxes from those who made the decision not to pay them." (dissenting opinion, p. 551).

Conversely, the discussion above amply demonstrates Security Pacific's control over financial decision-making, and thus its liability. As a preliminary matter, however, the court must determine whether Security Pacific is a "person" within the ambit of section 6672. Without citing any authority, Security Pacific baldly asserts that it is not a "person" "under the decisional law of this Circuit." (Tender of Proposed Findings of Fact and Conclusions of Law, p. 31, 3/14/90). The language of section 6671(b), which defines "person," is inclusive rather than restrictive, and provides that:

> [T]he term "person", as used in this subchapter, *includes* an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs. (emphasis added).

While the language does not expressly include corporations or partnerships, both have been held liable under section 6672 in this Circuit. *See Purdy Co. of Illinois v. United States,* 814 F.2d 1183 (7th Cir.1987) (corporate lender); *Lesher v. United States,* 440 F.Supp. 372 (N.D.Ind.1977) (the term "person" includes a partnership). In *Pacific National Insurance Co. v. United States,* the Ninth Circuit ruled that section 6672

> is broad enough to reach corporations and other artificial entities, as well as natural beings. The Code expressly provides that unless "otherwise distinctly expressed or manifestly incompatible

with the intent ... [t]he term 'person' shall be construed to mean and include an individual, a trust, estate, partnership, association, company or corporation." 26 U.S.C. § 7701(a)(1). And since artificial entities commonly provide operating, accounting, and management services for independent businesses, it is not "manifestly incompatible" with the intent of section 6672 to include them within its reach.

422 F.2d 26, 30 (9th Cir.1970).[6] The Seventh Circuit cited this opinion with approval in noting that section 6672 reached entities as well as individuals. *Adams v. United States,* 504 F.2d 73, 75–76 (7th Cir.1974). Other Circuits considering this question have reached the same conclusion.[7]

15. Section 6672 liability encompasses businesses which control an employer's financial affairs. *Purdy,* 814 F.2d at 1188; *Adams v. United States,* 504 F.2d at 76. Security Pacific's control of Mystik's finances and the decision-making process for choosing which creditors to pay (in preference to paying the United States) was abundantly manifest, and suffices to warrant liability. *Cf. Merchants Nat. Bank of Mobile v. United States,* 878 F.2d 1382 (11th Cir.1989).[8]

16. Security Pacific's contention that it was not a "responsible" person because it did not initiate Mystik's funding requests is not supported by case law. Who initiates specific funding requests to lenders is not a litmus-test for determining responsibility. The entire context of the Mystik—Security Pacific relationship must be considered. *Cf. Latimer v. United States,* 593 F.Supp. 881, 884 (N.D.Ill.1984), *affd.* 774 F.2d 1167 (7th Cir.1975). Furthermore, Security Pa-

---

**5.** It follows from this ruling that Vaccarella is entitled to judgment on his counterclaim for the income tax wrongfully withheld from his 1987 income tax filing.

**6.** That court further noted that section 6672 liability is "not restricted to the classes of persons specifically listed"; "[i]ts scope is illustrated rather than qualified by the specified examples." 422 F.2d 26, 30.

**7.** *See, e.g., Merchants Nat. Bank of Mobile v. United States,* 878 F.2d 1382 (11th Cir.1989);

*Caterino v. United States,* 794 F.2d 1 (1st Cir. 1986); *Fidelity Bank N.A. v. United States,* 616 F.2d 1181 (10th Cir.1980); *Anderson v. United States,* 561 F.2d 162 (8th Cir.1977); *United States v. North Side Deposit Bank,* 569 F.Supp. 948 (D.Penn.1983).

**8.** Even if Zintgraff and/or Vaccarella shared Security Pacific's culpability, Security Pacific's liability would not thereby be diminished. *Muntwyler v. United States,* 703 F.2d 1030 (7th Cir.1983).

cific errs in arguing that under *Purdy*, a lender can only be liable under section 6672 if it affirmatively directs payments to certain creditors. *Purdy* establishes no such rule. While the lender in *Purdy* did affirmatively direct payments (in addition to vetoing proposed payments to other creditors), this fact simply supported the trial court's determination that the lender wielded significant control over disbursement decisions. The court did not hold that such a circumstance was necessary to support a finding that a lender is "responsible".

■ 17. It is also clear that Security Pacific's behavior satisfies the "willfullness" element of section 6672. In *Levit v. Ingersoll Rand Financial Corp.*, the Seventh Circuit stated that

> Wilful is a term with many shadings, but its incarnation in § 6672(a) means at least reckless. "[T]he responsible person is liable if he (1) clearly ought to have known that (2) there was a grave risk that withholding taxes were not being paid and if (3) he was in a position to find out for certain very easily." (citations omitted).

874 F.2d 1186, 1192 (7th Cir.1989). The Seventh Circuit has also cautioned that requiring a high degree of recklessness would thwart the purpose of the statute. *Wright v. United States*, 809 F.2d 425, 427 (7th Cir.1987).[9] In the present case, it is not necessary to distinguish between degrees of recklessness, because Security Pacific had actual knowledge of its responsibility to pay the withholding tax, and consciously disregarded that duty.

When the payroll tax check bounced, Mr. Lansangan informed Smetana at Security Pacific immediately. Vaccarella also spoke with Smetana, and even mailed a memo of the conversation to Smetana. At the June 28, 1983, meeting, the Security Pacific representatives were already aware that the payroll tax check had bounced. Indeed, Mr. Tamborello's comment that Security Pacific was responsible for paying the tax,

but would not do so until the government "tapped him on the shoulder" betrays not only an awareness of the problem, but a callous disdain for Security Pacific's legal responsibility.

18. In sum, Security Pacific failed to show by a preponderance of the evidence that it was not a "responsible person," or that it did not act willfully. Therefore the government is entitled to judgment against Security Pacific under section 6672.

■ 19. Section 3505(b) provides that if a lender

> "supplies funds to or for the account of an employer for the specific purpose of paying wages of the employees of such employer, with actual notice or knowledge ... that such employer does not intend to or will not be able to make timely payment of [the withholding taxes], the lender shall be liable in his own person to the United States in a sum equal to the taxes (together with the interest) which are not paid over to the United States by such employer with respect to such wages. However, the liability of such lender, surety, or other person shall be limited to an amount equal to 25 percent of the amount so supplied.

26 U.S.C. § 3505(b). *See United States v. Intercontinental Industries, Inc.*, 635 F.2d 1215 (6th Cir.1980). This section was added to the 1954 Code by the Federal Tax Lien Act of 1976, P.L. 89–719, 80 Stat. 1125, Sec. 105(a). The legislative history (S.Rep. No. 1708, 89th Cong., 2d Sess., pp. 21–22, U.S.Code Cong. & Admin.News 1966, p. 3722) indicates that section 3505(b) was intended to deal with the problem of "net payroll financing." Net payroll financing is a devise used by lenders who desire to minimize their costs and their risks in advancing money to employers in poor financial condition by advancing funds sufficient only to cover the employer's net payroll.[10]

---

**9.** Had it been necessary for the court to decide whether Zintgraff or Vaccarella acted "willfully," the answer would have been in the affirma-

tive. Both had actual knowledge that the withholding tax check had bounced.

**10.** The Senate Report stated, "[y]our committee believes that where third persons finance em-

20. In *Intercontinental Industries,* the court held that "to prove a case under Section 3505(b) it is only necessary for the government to show that a lender advanced funds to an employer with knowledge that some or all of the funds will be used to pay net wages. It is not necessary for the government to prove the lender knew in advance the exact amounts that were to be used for wages." 635 F.2d 1215, 1220 (6th Cir.1980).

21. Up until the time the payroll tax check bounced on May 19, 1983, Security Pacific had always funded gross payroll. After the check bounced, however, Security Pacific decided to fund only net payroll, despite its knowledge that this could entail tax liability. From May 23 to June 8, 1983, Security Pacific advanced $204,362.17 directly to Mystik payroll accounts with the knowledge that Mystik had no other source from which it could get money to pay the withholding tax. These actions fit squarely within section 3505(b)'s proscription.

22. Wage withholding taxes are a "tempting source of ready cash" for financially troubled employers or their lenders, *Slodov v. United States,* 436 U.S. 238, 243, 98 S.Ct. 1778, 1783, 56 L.Ed.2d 251 (1978); Security Pacific was unable to withstand this temptation. In attempting to make Mystik more attractive to potential buyers, Security Pacific consciously decided not to pay the taxes withheld from employee wages.

■ 23. The government does not contend that it is entitled to recover twice for Mystik's unpaid taxes. Collection in full for Security Pacific's section 6672 and section 3505 liabilities will not result in double recovery, because the amounts recovered under section 6672 will be applied to trust fund taxes and post-assessment interest accrued thereon, while the amounts collected under section 3505(b) will be applied only to

interest on the original assessment against the corporation up to the date of the section 6672 assessment. In the present case the section 6672 assessment against Security Pacific was entered on August 5, 1987; thus the government can recover the full amount of the unpaid withholding taxes ($241,588.70) plus the interest accruing on that amount from August 5, 1987. The interest that can be recovered under section 3505(b) is calculated from the date the employer's quarterly withholding tax return is due. Treas.Reg. § 31.3505–1(b)(1)(ii); *O'Hare v. United States,* 878 F.2d 953 (6th Cir.1989); *United States v. Intercontinental Industries, Inc.,* 635 F.2d 1215, 1221–22 (6th Cir.1980). Therefore the government may recover, under section 3505(b), only the interest that has accrued on the unpaid taxes beginning July 31, 1983, until August 5, 1987, the date of the section 6672 assessment. The amount of such interest, calculated pursuant to section 6601, totals $127,732.81.

24. But the plain language of section 3505(b) limits the total liability for taxes and prejudgment interest to 25 percent of the amount supplied for wages. *United States v. Intercontinental Industries, Inc., supra,* at 1221–22; *United States v. Metro Construction Co., Inc.,* 602 F.2d 879 (9th Cir.1979). In the present case the amount supplied for Mystik wages was $492,038.01., 25 percent of which is $123,009.50. The entire amount of this judgment can be applied to interest on the trust fund tax amount that accrued prior to the date of the section 6672 assessment, and no part of the section 3505(b) judgment will be left over to be applied to reduce the amount collectible under the section 6672 judgment. Therefore the government will not get a double recovery.

25. The government has entered two separate presumptively valid assessments against Security Pacific, both of which are strongly supported by the evidence. Ac-

ployer's payrolls subject to the conditions set forth below they should be liable for the withholding taxes. It sees no reason for distinguishing between the portion of the total wages which is owed and should be paid to the employees (the 'net' wages), and the portion of the wages which is owed and should be paid to the Government in the form of withholding taxes.

These taxes are, in reality, a portion of an employee's wages for which he is given credit in the computation of his own tax liability; the fact that this portion of the wages is payable directly to the Government does not alter its basic nature." S.Rep. No. 1708, *supra,* p. 72, U.S.Code Cong. & Admin.News 1966, p. 3743.

cordingly, judgment is hereby entered in favor of the government and against Security Pacific on the government's claim under section 6672 and its claim under section 3505(b).

IT IS SO ORDERED.

### JUDGMENT

In accordance with the court's entry of this date, JUDGMENT is hereby entered in favor of Mssrs. Vaccarella and Zintgraff and against the United States of America on the United States' claims under 26 U.S.C. § 6672. JUDGMENT is also hereby entered in favor of Mr. Vaccarella on his counterclaim against the United States. Further, JUDGMENT is hereby entered in favor of the United States and against Security Pacific Business Credit, Inc., on the United States' claims under 26 U.S.C. § 6672, and under 26 U.S.C. § 3505(b).

It is so ORDERED.